In the Matter of Phillip COOHON, Mary Jo Coohon, Michael Coohon,

Nancy COOHON, Appellant
(Respondent Below),

v.

ALLEN COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee
(Petitioner Below).

No. 3–1179A326.

Court of Appeals of Indiana,
Fourth District.

Oct. 23, 1981.

Ralph S. Adams, Dorie Budlow, Fort Wayne, for appellant.

David Stewart, Stewart & Miller, Fort Wayne, for appellee.

MILLER, Judge.

Respondent-appellant, Nancy Coohon, appeals from the decision of the Allen County Superior Court, Juvenile Division declaring Nancy's children, Phillip and Mary Jo Coohon, to be permanent wards of the Allen County Department of Public Welfare (the Department) for all purposes including adoption as the Department had requested.[1] Nancy raises two issues on appeal.

---

1. In her Motion to Correct Errors Nancy sought a reversal of the juvenile court's decision to declare a third child, Michael Coohon, a *temporary* ward of the Department. However, Nancy has failed to address any issue concerning this portion of the court's decision in her appellate brief. Therefore, it is waived. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). We

1) Did the juvenile court lack subject-matter jurisdiction to terminate Nancy's parental rights?

2) Did the court incorrectly apply certain legal standards in terminating her parental rights?

For the reasons stated below, we affirm the juvenile court's decision.

## FACTS PRESENTED

On October 7, 1977 the Department filed a petition requesting the Allen County Juvenile Court to declare Phillip and Mary Jo the Department's temporary wards for aid and placement purposes. Finding the existence of an emergency situation, the court made the children the Department's temporary wards (retroactive to October 6) pending a hearing which was held on November 4, 1977. Ten days later the court granted the petition finding that a situation of dependency and neglect existed. Subsequently, the Department filed its casework plan for Nancy which stated:

"CASEWORK PLAN REGARDING NANCY COOHON Cause No. W–77–144

Nancy Coohon agrees to the following provisions of this casework plan:

1. To obtain adequate housing for herself and her children.
2. To obtain and maintain a standard of cleanliness not detrimental to hers [sic] and her children's health.
3. To work with a homemaker to learn more appropriate homemaking skills.
4. To obtain appropriate medical care for herself and her children.
5. To cooperate with and follow the recommendations of the Allen County Department of Public Welfare caseworker.

DATE: 11/15/77    s/s NANCY COOHON
                  MOTHER
DATE: 11/15/77    s/s SHIRLEY A. REBER
                  CASEWORKER"

note that Phillip and Mary Jo's individual fathers received notice of the Department's petition but failed to appear and their parental rights were terminated. They are not parties to this appeal.

The Department on September 28, 1978 initiated the action now before us by filing its petition in the juvenile court seeking an order declaring Phillip and Mary Jo the Department's permanent wards for all purposes including adoption. Specifically, it claimed Nancy did not provide her children a safe, stable environment or consistently follow the casework plan.[2] The evidence submitted to the trial court in the first part of 1979 supported these claims and can be summarized as follows:

Caseworker Reber testified she explained to Nancy the terms of the casework plan emphasizing that her compliance was a prerequisite to regaining custody of Phillip and Mary Jo. Upon discovering Nancy was moving frequently and had been living with various men (one of whom was married), Ms. Reber warned Nancy she was harming her opportunity for regaining custody. Tom Doust, a social worker with the Catholic Social Service, testified he counseled Nancy on 21 separate occasions (each lasting about one hour) from March to December, 1978. Over the course of these sessions Mr. Doust observed no improvement in her initial inability to cope with her environment. An employee of the Department's Child Protective Service, Josephine Newnum, observed Nancy's living quarters in June, 1978 and described it as 11 people living in the same home which was permeated with a pet odor so offensive it made "your eyes burn and your nose burn."

Nancy, testifying as the only witness on her own behalf, admitted moving at least eight times between November, 1977 and the first part of 1979 as well as living with various men one of whom had been married at the time. She acknowledged that when she signed the casework plan, at the time Phillip and Mary Jo were made temporary wards of the Department, she thought preconditions to regaining custody of her chil-

2. On the same day the Department filed a second petition alleging on the same basis that Michael was a dependent, neglected child and requesting an order making him the Department's temporary ward for aid and placement purposes. See fn. 1, *supra*, p. 450.

dren were living alone (or marrying) and acquiring adequate housing. Despite contacting only one housing agency from a list supplied by Ms. Reber, Nancy claimed she could not locate an apartment within her price range since she was unemployed. Nancy attributed her unemployment to her poor health; however, she did admit she had not held a full time job since 1975.

The Allen Juvenile Court on May 31, 1979 entered its findings and order making Phillip and Mary Jo the Department's permanent wards for all purposes including adoption and terminating Nancy's parental rights in them. Nancy appeals raising the previously stated issues.

## DECISION AND DISCUSSION

*Issue One*

██ Nancy urges this Court to reverse the termination of her parental rights on the ground that the juvenile court lacked subject-matter jurisdiction over the Department's petition. She concedes that under our *old* Juvenile Code, effective at the time the petition was filed, a juvenile court could have terminated parents' rights in their child as a dispositive remedy after finding the child to be dependent and neglected. Ind.Code 31–5–7–15(b)(5).[3] However, Nancy argues that, although IC 31–5–7–15(b)(5) did not contain a requirement of any time limitation between deprivation of the parents' custody of the child and the filing of a petition to terminate parental rights, the *old* Adoption Code (effective at the time the petition was filed) did contain such provision requiring a two year period of deprivation of parental custody as a condition

precedent to foregoing parental consent to adoption. Ind.Code 31–3–1–6(g)(7).[4] Now Nancy insists these two statutes must be read in *pari materia* and, if so construed, the juvenile court lacked jurisdiction because it is admitted that less than one year elapsed between the court's November, 1977 order making Phillip and Mary Jo the Department's temporary wards and the September, 1978 petition to terminate Nancy's parental rights.[5]

To resolve the issue Nancy presents us, it is first necessary to review the statutes conferring jurisdiction to terminate parental rights (including the right to consent to adoption) which were effective at the time of the Department's petition. Section 7 of the Adoption Code (IC 31–3–1–7; repealed by Acts 1978, P. L. 136, § 28) specifically provided the procedure to terminate parental rights either "in or *prior* to an adoption proceeding." (Emphasis added). Specifically, Section 7(c) stated:

*"All rights of a parent with reference to a child, including right to control or consent to an adoption, may be terminated by order of a court having jurisdiction to terminate parental rights on any ground for termination specified in that law.* In addition, all rights of a parent with reference to a child, including right to control or consent to an adoption, may be terminated by the court having jurisdiction over adoption proceedings under this chapter issued on any ground provided by law for termination of parental rights. When the court terminates parental rights under this chapter [IC 31–3–1–1—31–3–1–12] its paramount concern

3. This section was repealed by Acts 1978, P. L. 136, § 28 and replaced with our current Juvenile Code, Ind. Code 31–6–5–4, effective October 1, 1979. Acts 1978, P.L. 136, § 59A.

4. This section was repealed by Acts 1978, P. L. 136, § 28.

5. In its response the Department counters that the legislature had two distinct objectives and thereby created two distinct mechanisms for terminating parental rights with the Allen Juvenile Court properly predicating its subject-matter jurisdiction on IC 31–5–7–15(b)(5) as opposed to a probate court's jurisdiction to termi-

nate parental rights under the Adoption Code, Ind. Code 31–3–1–7 (repealed by Acts 1978, P. L. 136, § 28). As discussed *infra*, while there were two mechanisms our interpretation is premised upon IC 31–3–1–6(g)(4, 7).

Prior to examining the issue we observe that the current Juvenile Code has the sole provision for terminating parental rights where adoption proceedings are not involved. Significantly, the child must be removed from the parent's custody for six months prior to the termination of the parental rights. IC 31–6–5–4.

shall be for the health, welfare and future of the child whose adoption is immediately contemplated or who in the future will hopefully be adopted. The purpose of this chapter in regard to the termination of parental rights is to give to unfortunate children who have been bereft of love and parental care the benefits of a home, and of such parental care, and the law should receive a liberal construction to effect this purpose. (Emphasis added.)

While the old Juvenile Code (Ind. Code 31–5–1–1 *et seq.*) lacked any section specifically dealing with the termination of parental rights, this Court in *In re Perkins*, (1976) 170 Ind.App. 171, 352 N.E.2d 502, held, pursuant to IC 31–5–7–15(5), that a juvenile court possessed jurisdiction to terminate all parental rights as an alternative, dispositive remedy. The juvenile court in *Perkins*, in response to a petition by the Allen County Welfare Department, declared the children of Marvin and Mary Perkins permanent wards of the Department and terminated their parental rights including their right to object to a later adoption. On appeal this Court was asked to determine if the juvenile court's action was appropriate and authorized by language of the Juvenile Code appearing at IC 31–5–7–15 which required a hearing and judgment upon an application by the Department alleging that a child was abused, dependent or neglected. In reaching its holding the Court relied upon the following language from IC 31–5–7–15:

> "If the court shall find that the child comes within the provisions of this chapter [IC 31–5–7–1—31–5–7–25], it may by order duly entered, proceed as follows:
>
> (1) Place the child on probation or under supervision in his own home or in the custody of a relative or other fit person, upon such terms as the court may determine;
>
> (2) Commit the child to any suitable public institution or agency, which shall include, but is not limited to, the state institutions for the feeble-minded, epileptic, insane, or any other hospital or institution for the mentally ill, or commit the child to a suitable private institution or

agency incorporated or organized under the laws of the state, and authorized to care for children or to place them in suitable approved homes;

> (3) The court may make such child a ward of the court, a ward of the department of public welfare of the county, or a ward of any licensed child placing agency in the state willing to receive such wardship;
>
> (4) May take cause under advisement or postpone findings and judgment for a period not to exceed two [2] years unless sooner requested by the party proceeded against in which event not to exceed ninety [90] days;
>
> (5) *Make such further disposition as may be deemed to be to the best interests of the child, except as herein otherwise provided.*" (Emphasis added.)

*In re Perkins, supra* at 175, 352 N.E.2d at 505. Furthermore, the Court cited Section 7 from the Adoption Code (IC 31–3–1–7). Significantly, Section 7(c) provides probate and *other courts* jurisdiction to terminate "[a]ll rights of a parent with reference to a child, including right to control or consent to an adoption, . . . ." Such termination may be "by order of a court having jurisdiction to terminate the parental rights on any ground for termination specified in the law." *Id.* Finally, the Court held that such termination of parental rights could be made "only where the evidence discloses a protracted history of dependency or neglect by the parent(s) as defined by statute, a substantial probability of such deprivation of the child in the future, and that it is not reasonably probable that it will serve the future welfare of the child to continue such child's legal relationship with the parent(s)." *Perkins, supra* at 182, 352 N.E.2d at 509, *cited with approval in Matter of Miedl*, (1981) Ind., 425 N.E.2d 137.

Thus at the time Nancy's parental rights were terminated, there were two statutes available for such action, and either a court exercising juvenile jurisdiction or one exercising probate jurisdiction could have made that determination. Here the Department

elected to proceed in the juvenile court, undoubtedly for the reason that it had initially petitioned that court for temporary wardship over the children as part of its efforts to restore the family relationship between Nancy and her children prior to taking the more drastic action of seeking termination of her parental rights. Additionally, it is especially important to our opinion that neither of the two mechanisms for terminating parental rights nor the *Perkins* opinion created as a condition precedent to such termination a requirement that the parent(s) be deprived of custody of the child for a specific period.

Addressing Nancy's particular claim that there was such a requirement of a two year period of custodial deprivation, we note her claim is based upon a reference to Section 6 of the Adoption Code (IC 31–3–1–6(g)) dealing with parental consent to an adoption petition, which in pertinent part reads as follows:

"(g) *Consent to adoption is not required of*:

(1) a parent or parents if the child is adjudged to have been abandoned or deserted for six [6] months or more immediately preceding the date of the filing of the petition; or a parent of a child in the custody of another person if for a period of at least one [1] year he fails without justifiable cause, to communicate significantly with the child when able to do so or he wilfully fails to provide for the care and support of the child when able to do so as required by law or judicial decree, or if the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents;

(2) the natural father of a child born out of wedlock whose paternity has not been established by a court proceeding;

(3) a parent who has relinquished his right to consent as provided in this section;

(4) *a parent whose parental rights have been terminated by order of court as provided under section 7 [IC 31–3–1–7] of*

*this chapter or by order of court having jurisdiction to terminate parental rights on any ground for termination specified by other law*;

(5) a parent judicially declared incompetent or mentally defective if the judge dispenses with the parent's consent;

(6) any legal guardian or lawful custodian of the person to be adopted other than a parent who has failed to respond in writing to a request for consent for a period of sixty [60] days or who, after examination of his written reasons for withholding consent, is found by the court to be unreasonably withholding his consent;

(7) *a parent or parents of a child who has been cruelly treated or neglected, if the child has been declared an abused, dependent or neglected child by the court of jurisdiction, and the parent or parents deprived of his custody for a period of two [2] years prior to the filing of a petition to terminate parental rights, if there has been little or no change in the environment from which the child was removed*;

(8) the parent or parents of a child where the parent or parents suffer a disability because of the habitual use of alcohol, or any of the controlled substances in schedules I through V of IC 1971, 35–24.1 [IC 35–24.1–2–4—35–24.1–2–11], except when the controlled substances are used as part of a medically prescribed plan, and, if the child has been declared an abandoned, abused, dependent or neglected child by the court, and the parent or parents deprived of his custody for a period of two [2] years continuously immediately prior to the filing of the petition for termination of parental rights. The parent or parents must have been deprived of custody of the child because of a disability as described in this chapter [IC 31–3–1–1—31–3–1–11]. Petitioner shall be required to show that the disability renders the parent or parents unable to adequately care for and control the child." (Emphasis added.)

Nancy directs our attention to subsection 7 of IC 31–3–1–6(g) claiming this language, when read in *pari materia* with the other provisions of the Juvenile Code (IC 31–5–7–15(b)(5)), require the Department to establish that she was deprived of custody for two years prior to terminating her rights. However, she makes no reference to subsection 4 of IC 31–3–1–6(g) which deprives her of the right to object to an adoption if her rights have been terminated by either of the two aforementioned alternative methods, i. e. under Section 7 of the Adoption Code (IC 31–3–1–7) or under the Juvenile Code (IC 31–5–7–15(b)(5)). It is apparent that if we adopt Nancy's theory, subsections 4 and 7 would be in direct conflict. Thus, according to Nancy's interpretation, although subsection 4 precludes her right to object where parental rights have been terminated, yet under subsection 7 she would maintain that right if there were no showing that she had been deprived of custody for a period of two years before the petition to terminate was filed.

According to a basic rule of statutory construction, we are required to construe two statutory provisions on the same subject to give effect to both. *Economy Oil Corp. v. Indiana Department of Revenue,* (1975) 162 Ind.App. 658, 321 N.E.2d 215. Applying this rule we have no difficulty in concluding that subsection 7 is not applicable to Nancy's situation. As noted in *Perkins*:

". . ., proceedings for the termination of parental rights have more serious consequences than those involving a change of custody of a child. If a child is found to be dependent or neglected within the meaning of the appropriate juvenile statutes and custody is awarded to an individual or entity other than the parent(s), such deprivation of parental custody and control may temporarily alter the personal relationships between child and parent, but it does not affect any of the legal rights and responsibilities between the parent and child. A termination of parental rights, however, 'divest[s] the parent and the child of all legal rights, privileges, duties and obligations, including

rights of inheritance, with respect to each other.' IC 1971, 31–3–1–7(g), *supra.*"

*In re Perkins, supra,* 170 Ind.App. at 181, 352 N.E.2d at 509. It is apparent from the foregoing language and the provisions of the Juvenile Code (IC 31–5–7–15) that where a child was abused, dependent or neglected and was so found by the Juvenile Court, the statute provided numerous alternative dispositions in addition to the termination of parental rights. These options left open to the court the opportunity to account for changing circumstances and make every effort to restore the family relationship. It is this situation which the legislature recognized by enacting subsection 7 providing that where the parent has been deprived of custody because of abuse, dependency or neglect, but not deprived of parental rights, the parent still possesses the right to object to adoption if such parent has not been deprived of the custody of the child for a period of two years before the adoption proceedings had been instituted.

We conclude that where parental rights, under the then effective statutes, were terminated by appropriate proceedings in either a juvenile or probate court, the natural parent's consent to adoption was not required under the specific language of subsection 4 of IC 31–3–1–6(g). Further subsection 7 of IC 31–3–1–6(g) was applicable only in those instances where a Juvenile Court deprived a parent of custody and not of parental rights. Thus Nancy's claim that the provisions of subsection 7 affected the jurisdiction of the Juvenile Court to exercise its right to terminate her parental rights pursuant to IC 31–5–7–15(b)(5) is without merit.

*Issue Two*

Nancy's remaining issue generally is that the juvenile court erred by applying inappropriate evidentiary standards in terminating her rights. In her appellate brief this issue is broken down into five specific subissues. She claims the court erred:

1) in finding that Nancy's violation of the November, 1977 casework plan was *per se* evidence of neglect;

2) in applying a standard of historical neglect lasting less than two years in duration;

3) in misapplying a standard of neglect requiring the court to determine that conditions which led to the November, 1977 deprivation of custody continued to exist in May, 1979;

4) in failing to find a substantial probability of deprivation of the children in the future; and

5) in failing to find that it was not reasonably probable that the future welfare of the children would be served by a continuation of their relationship with Nancy as their parent.

Our examination of Nancy's Motion to Correct Errors reveals she raised three general issues. The first two issues challenged the juvenile court's decision declaring Michael the Department's temporary ward. Nancy has waived these two issues since she failed to argue them in her appellate brief. *Liddy v. Companion Ins. Co.*, (1979) Ind.App., 390 N.E.2d 1022; A.R. 8.3(A)(7).

The third issue attacked, as contrary to law, is the court's judgment terminating Nancy's parental rights. In the memorandum accompanying her motion Nancy specified three errors making the judgment contrary to law. The first, which we have resolved, claimed the court lacked subject-matter jurisdiction. The second alleged the Department failed to provide Nancy sufficient services to aid in her efforts to overcome the problems resulting in the termination of her rights. However, Nancy has not argued this issue on appeal; therefore it is waived. *Id.* Finally, as the court's third

error Nancy challenged the Department's casework plan as an unconstitutional delegation of judicial authority allowing the Department to impose as a prerequisite to regaining custody of Phillip and Mary Jo conditions not approved by the court through its November, 1977 order temporarily depriving her of custody. In her appellate brief Nancy fails to address this issue; therefore, it also is waived. *Id.* Instead, in her brief, Nancy attempts to raise on appeal a general issue not presented to the trial court in her Motion to Correct Errors, i. e., did the court apply inappropriate evidentiary standards in terminating her rights. Consequently, this last issue is also waived.[6] *Id.*

Judgment affirmed.

CHIPMAN, P. J., and YOUNG, J., concur.

---

**6.** In Nancy's Motion to Correct Errors she claims "the court's order reflects it was [Nancy's] violation of the casework plan which caused [the court] to terminate [her] parental rights. Basing its findings on [her] failure to abide by the terms of the plan, [the court] is holding that violation of the plan" is evidence of continuing neglect. This is incorrect. The court did make a finding noting she violated certain provisions of the plan, but it did not state that such violation was itself sufficient to terminate her parental rights. Moreover, its findings detailed Nancy's inadequacy (as we have summarized in our description of the tes-

timony, *supra*), including failing to cooperate with the Catholic Social Service worker (Mr. Doust) which was not part of the plan. Consequently, the court focused its attention on Nancy's habits and lifestyle as they affected her ability to provide for the health, welfare and future of her children. There is no indication in the court's findings and judgment that it considered the mere violation of any part of the plan as justification for terminating her rights. In *Matter of Miedl, supra*, under similar facts as the ones before us, our Supreme Court upheld the termination of a mother's parental rights.