**In the Matter of Charles Damon MIEDL, a child under the age of 18 years.**

**In the Matter of Shaun David MIEDL, a child under the age of 18 years.**

No. 881S211.

Supreme Court of Indiana.

Sept. 3, 1981.

ON PETITION TO TRANSFER

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Fourth District Court of Appeals. On October 9, 1979, the LaPorte Juvenile Court granted the petition of the LaPorte County Welfare Department to terminate the parental rights of Glenda Miedl and her two minor children, Charles and Shaun.

The Court of Appeals held the termination of the mother's parental rights was improper since the trial court did not comply with statutory requirements and, further, that there was insufficient evidence in the record before the trial court. *Matter of Miedl*, (1981) Ind.App., 416 N.E.2d 491.

We find the trial judge did not commit reversible error in entering his judgment and we accordingly grant transfer, vacate the opinion of the Court of Appeals and affirm the trial court.

The record shows that there was a long involvement with the natural mother, Glenda Miedl, and the authorities, regarding the custody and care of her two children. As a matter of fact, most of the lifetime of these children was spent as wards of the LaPorte County Department of Public Welfare. Charles Damon Miedl was born on May 6, 1976. He became a ward of the LaPorte County Department of Public Welfare barely more than three months later, on August 22, 1976. Shaun David Miedl was born on April 24, 1978. He became a ward of the LaPorte County Department of Public Welfare on May 11, 1978. Both of these children remained wards of the LaPorte County Department of Public Welfare under the jurisdiction of the Court in one manner or another up to and including the day of October 9, 1979, when the Order of Permanent Termination of Parental Rights was entered by the trial court. The August 22, 1976 wardship of Charles was based on a disorderly conduct charge against Glenda; she was later committed to the psychiatric floor of the LaPorte Hospital for a 72 hour observation on August 23, 1976. On August 31, 1976, Charles was returned to Glenda and her aunt, but the wardship continued. On November 30, 1976, custody of Charles was again taken by the Department after a petition was filed by a juvenile probation officer alleging Glenda had threatened Charles' life. Custody of Charles was again returned to Glenda on July 12, 1977, but wardship continued with the Welfare Department.

Shaun was born on April 24, 1978, six weeks premature. He remained in the hospital due to a respiratory problem. During this period, on May 8, Glenda was again committed to the psychiatric floor of the LaPorte Hospital. Charles was again taken into custody by the Welfare Department, with Glenda's agreement, and placed in a foster home. When Shaun was ready to be released from the hospital on May 11, he was made a temporary ward of the department because of the absence of Glenda from her home. The record shows that on June 15, 1978, Judge Donald Martin held a hearing to decide whether to terminate the wardships of both boys. Judge Martin continued the wardships, including the custody of the two boys by the Welfare Department for placement in foster homes, and set goals for Glenda to achieve before the court would terminate the wardships. She was to become a rational, reasonable, adult person, learn to cope with everyday life, and avoid excess temper, emotional outburst, alcohol and drugs. She was to maintain a good personal appearance, a clean home, and attain financial stability.

The record shows that on February 28, 1979, Judge Martin ordered Shaun returned to Glenda and on March 6, ordered Charles returned to her. This was done by oral order to the Welfare Department without any entry in the record. Judge Martin explained that he did this to give Glenda a trial period with both children to see if she could handle them. She kept both children with her until May 2, 1979, when she was admitted to the hospital emergency room complaining of headaches and vomiting. The Welfare Department notified Judge Martin of Glenda's incapability at this time and he ordered that the children be returned to their foster parents. This again was done by an oral order to the Welfare Department. On May 30, Glenda filed her petition for termination of wardship, alleging that she had accomplished Judge Martin's goals and that it would be in the best interest of her children for the court to terminate their wardships and return them to her. The LaPorte County Welfare Department, through its case worker, Patricia Kasko, filed a petition on June 8, asking that Glenda's parental rights be permanent-

ly terminated for the health, welfare, and future of the minor children and that the LaPorte County Department of Public Welfare continue to keep custody of the children and grant the LaPorte County Department of Public Welfare authority to consent to the adoption of the minor children. Both of these motions were heard by the court on September 27, and October 3, 1979. The court entered judgment on October 9, 1979.

 Most of the witnesses called were involved with Glenda and her children through the professional needs of Glenda and her children or through public agencies organized for that purpose. Testimony could be summarized as indicating that Glenda was very unstable and totally unable to give her children the care they required. Such was the tenor of the testimony of Frieda Hammerman, Director of Social Services at St. Anthony Hospital; Dr. Paik, a pediatrician; Susan Brooks, ADC Supervisor for the Welfare Department; Patricia Parkman, a registered nurse at LaPorte County Visiting Nurses Association; Alice Petroff, Adult Basic Education Representative for the Michigan City area schools; Edith Hockberg, an employee of Orthopedic Associates of Michigan City; Kathryn Viggiano, Staff Therapist for the LaPorte County Mental Health Center; and Lynn Alexander, LaPorte County Department of Public Welfare. Among the findings made by the trial judge in his final orders are the following:

7. That during the latter part of February, 1979 (no entry on court records was made) the court on its own motion verbally ordered the return of the Children to Glenda Miedl, against the advice of the Department of Public Welfare. This order was made so that Glenda Miedl would be given the benefit of any doubt that she could in fact, care for these children.

8. This experiment proved to be a total failure and the children were again verbally (no court entry made) returned to the custody of the Department of Public Welfare.

9. In its order of June 21, 1978, this Court set certain goals for Glenda Miedl, one of which was that she become a rational responsible adult person by learning to cope with everyday life. The evidence clearly discloses that she is unable to cope with everyday life even while living alone, much less while she has the care of her children, during which time she is totally at sea and entirely dependent on agency support. Glenda Miedl is not an evil or viscous (sic) person and her inability to care for her children is not intentional, she is simply inadequate emotionally to handle everyday problems in rearing children. There is nothing to indicate she will improve and the law does not contemplate daily and continuous agency support ad infinitum.

10. That during the life of these wardships Glenda Miedl has received to one degree or another, assistance from the following agencies:
Comprehensive Mental Health Center, Hammond, IN
Lake County Department of Public Welfare
Tri-City Mental Health
LaPorte County Department of Public Welfare
Comprehensive Mental Health of LaPorte County
Visiting Nurses Association
Social Security Administration
CETA
Social Services of St. Anthony Hospital

11. This Court recognizes the rights of parents, as it is required by law so to do, but the welfare of the children is paramount. The entire record of this case points to only one conclusion, that the conditions resulting in the removal cannot reasonably be expected to improve and that the best interests of the children are served by termination of parental rights."

The problem here arose upon the question of which dispositional statute the court was to use in making its judgment on these petitions. The new code became effective

October 1, 1979, and the applicable section under that code is Ind.Code § 31–6–5–4 (Burns Repl. 1980). The applicable section under the code as it existed up to October 1, 1979, at which time it was repealed, was Ind.Code § 31–5–7–15(5) (repealed by Acts 1975, P.L. 296, § 9 and by Acts 1978, P.L. 136, § 57). The Legislature recognized the problem of a case such as this that comes at the transition period of the law and provided for it within the very statute. Acts 1978, P.L. 136, § 59 states: "... [T]his Act takes effect October 1, 1979; this Act does not apply to matters in which a court has entered a dispositional decree before October 1, 1979, except that a person authorized to move for modification of judgment may petition the court to apply this Act in such a matter." Judge Martin did provide that he was applying statute § 31–6–5–4 to Shaun's case but did not indicate he was doing so in the case of Charles.

It is very apparent here that the court's judgment is correct regardless of which statute is applied to the facts appearing in this record. Subjecting the trial court's judgment to a "seesaw-tug of war" between the two statutes would be noticeably injudicious and also quite unproductive. This is, of course, the problem the Legislature attempted to prevent by providing that the new statute would not apply to those cases in which a dispositional order had already been entered but would give the trial judge discretion to use the guidelines stated therein even in the event that such orders had been made.

There was ample evidence from which the court could find that the standards set down in the matter of *Perkins, et al., v. Allen County Department of Public Welfare*, (1976) 170 Ind.App. 171, 352 N.E.2d 502, were met in this case. The court made the finding in its Number 11: "The entire record of this case points to only one conclusion, that the conditions resulting in the removal cannot reasonably be expected to improve and that the best interests of the children are served by termination of parental rights." *Perkins* provided that the trial court must find delinquency or neglect to have been habitual or long standing, that

there was substantial probability of future deprivation of the children because of the habitual patterns of the parent, and that it was not foreseeable that the children's welfare would be served by continuing the parent-child relationship. *Id.* at 182, 352 N.E.2d at 509. The trial court made these findings and further indicated that the interests of the children were so affected that the parental rights had to give way. The record shows substantial support in the evidence for the judgment of the trial judge pursuant to § 31–5–7–15.

Neither can it be said that the judgment of the trial court falls short of the statutory requirements of § 31–6–5–4. Not only had the children been removed from their mother for much of the previous six months but they had been under the care and supervision of the Welfare Department for most of their lives. They had been in the physical custody of the Welfare Department for well over a year preceding the judgment, with the exception of the trial period the trial judge gave to Glenda in February and March. As the trial judge said in his order, this was a total failure. It was, however, an attempt to try to work with the parent and test her ability to function as a parent. It certainly is not reasonable to say now that this broke the chain of events to such an extent that to properly follow the law we need to start over again with a new six month period. Custody had not been changed in the orders of the court to give the mother physical custody. This was merely a temporary unofficial placement with the mother in an attempt to work with her as the law contemplates. It is certainly not grounds to reverse the judgment of the trial court.

■ There also was substantial evidence that termination of Glenda's parental rights was in the children's best interests under § 31–6–5–4. To say that this evidence was insufficient would be to substitute our judgment for that of the trial judge. Furthermore, we cannot accept the strained interpretation the Court of Appeals put on § 31–6–5–4(4) and (5). It was

certainly not the intention of the Legislature that the future plans for the children would be detailed in the evidence so that the Court could choose the "best" alternative for the children involved. Children are not taken from the custody of their parents because there is a better or the "best" place for them. They are taken because the present place in the custody of their parents is wholly inadequate for their very survival. Before a court can do anything with regard to the future of the children, it must first be found that the circumstances are such that the parental tie must be severed and a different direction found that gives some chance to the child or children. It is obvious the Legislature intended that the Welfare Department would point out in a general sense to the trial court the direction in which its plans were going. It could be that the case would involve a child that needed a great deal of medical or psychiatric care, one that was severely handicapped and needed special care along those lines, or one that needed a stable home in which to grow and mature as in this case. The Welfare Department indicated its future plan was to place these children for permanent adoption and the court gave the order for that to be done. In the meantime the court was well aware of the fact that the Welfare Department was placing the children in licensed foster homes, selected for their particular interest and expertise in keeping children of this type. This is the special duty of the Welfare Department and would be one of which the court was well aware. The child would not be placed in the custody of a particular foster home, but would be placed in the custody of the Welfare Department which would arrange for its temporary care until the time that the Department would present to the court an adoption petition by a home willing to take the child and give the court an opportunity to view and pass on that arrangement. It would be impossible for the Welfare Department to find and select a proposed adoptive home prior to the judgment that gives them a child to place for adoption.

It is apparent here that all of the various government agencies went more than the "second mile" with Glenda in attempting to assist her in raising her children. In return, she exhibited very hostile attitudes to these agencies and indicated by her actions that she was unable to cope with everyday problems of caring for children. The actions of the various departments were required to help her to such an extent that it was disruptive of their very operation and taxing on their personnel. As was indicated many times in the record, these departments cannot give all of their time to one person or one family. The trial judge had all of this evidence before him and made his findings based on these facts.

Transfer is granted, and the judgment of the trial court is affirmed.

GIVAN, C. J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.