IN THE MATTER OF ATKINS

Docket No. 56768. Submitted October 14, 1981, at Detroit.—Decided
January 20, 1982. Leave to appeal denied, 413 Mich —.

   In 1977, a petition was filed in the Juvenile Division of the
Wayne Probate Court seeking to have Jeffrey Samuel Atkins,
Lisa Michelle Atkins and James Joseph Atkins, the children of
Patricia Atkins, declared permanent wards of the court for the
purpose of adoption. The children had been in the temporary
custody of the probate court pursuant to a 1973 neglect and
dependency petition filed by the Wayne County Department of
Social Services and had been living in foster care homes. After
a hearing at which testimony concerning the mental stability
of Mrs. Atkins and the effect of such mental stability upon her
ability to care for the children was given, James E. Lacey, J.,
permanently terminated the parental rights of Mrs. Atkins,
permanent custody of the children being taken by the court for
the purpose of adoption. Mrs. Atkins appealed to the Wayne
Circuit Court. Peter B. Spivak, J., affirmed the decision of the
probate court. Mrs. Atkins appeals to the Court of Appeals by
leave granted. *Held:*

   1. One of the bases upon which the parental rights were
terminated was the provision in the juvenile code which per-
mits the probate court to take permanent custody where a
child has been in foster care in temporary custody of the
probate court for at least 2 years pursuant to a prior petition
for neglect and the parents fail to establish a reasonable

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 4 Am Jur 2d, Appeal and Error § 136.
   59 Am Jur 2d, Parent and Child §§ 39, 40.
[2] 59 Am Jur 2d, Parent and Child §§ 39, 40, 43.
[4, 5] 59 Am Jur 2d, Parent and Child § 27.
[6] 5 Am Jur 2d, Appeal and Error § 726.
   81 Am Jur 2d, Witnesses § 247.
   Privilege, in judicial or quasi-judicial proceedings, arising from
      relationship between psychiatrist or psychologist and patient. 44
      ALR3d 24.
[7, 8] 81 Am Jur 2d, Witnesses § 263.
[8] 81 Am Jur 2d, Witnesses § 241.

probability that they will be able to reestablish a proper home within the following 12 months. Under that provision it is not necessary to present further proofs of neglect. Since respondent mother herein failed to challenge in circuit court the original order of the probate court finding neglect, the question of neglect is not properly before the Court of Appeals in this appeal from the order of the probate court taking permanent custody.

2. The record supports the determination that the respondent mother would not be able to reestablish a proper home within a reasonable period of time.

3. The provision in the juvenile code permitting permanent termination of parental rights on the basis of mental illness does not violate the right to equal protection.

4. The standard to be applied in probate court proceedings to terminate parental rights pursuant to the juvenile code is whether the parents have been shown by clear and convincing evidence to be unfit and unable to become fit.

5. The erroneous admission of testimony which was properly subject to the psychiatrist-patient privilege does not mandate reversal since the other evidence adduced overwhelmingly supports the court's determination. The error was harmless.

Affirmed.

1. COURTS — PROBATE COURT — PARENT AND CHILD — CHILD CUSTODY — APPEAL.

The placement of a child in the permanent custody of the probate court on the basis of the provision in the juvenile code that permanent custody may be had upon a finding that a child had been in foster care in temporary custody of the court for at least 2 years on the basis of a neglect petition and the parents fail to establish on rehearing that a reasonable probability exists that they will be able to reestablish a proper home for the child within the following 12 months does not require further proof of neglect; the failure of the parents to challenge in a circuit court appeal of the probate court's order granting permanent custody the propriety of the probate court's original finding of neglect or to file with the Court of Appeals a transcript of the original proceedings precludes review by the Court of Appeals, in an appeal from the order granting permanent custody, of the question of the original determination of parental neglect (MCL 712A.19a[f]; MSA 27.3178[598.19a][f]).

2. PARENT AND CHILD — PROBATE COURT — EVIDENCE — APPEAL.

The Court of Appeals will not overturn a determination by a

probate court placing a child in the permanent custody of the court where there is adduced sufficient evidence to support the finding that the child's parents were unfit and were unable to become fit within a reasonable period of time.

3. PARENT AND CHILD — CHILD CUSTODY — JUVENILE CODE — CONSTITUTIONAL LAW.

The provision in the juvenile code permitting the probate court to take permanent custody of a child on the basis that for a period of two years the parents have been unable to provide proper care and custody to the child because of mental illness and will not be able to provide such care within a reasonable time does not violate the right to equal protection, the termination of the parents' rights not being based merely on the mental illness but rather on the effect of the mental illness upon the ability of the parents to provide proper care (MCL 712A.19a[c]; MSA 27.3178[598.19a][c]).

4. PARENT AND CHILD — CHILD CUSTODY — PROBATE COURT — BURDEN OF PROOF.

The burden upon the parents of a child who has been placed in the temporary custody of the probate court at a hearing on whether the court should take permanent custody is the burden to go forward with evidence establishing their fitness rather than the burden of proof of their fitness (MCL 712A.19a; MSA 27.3178[598.19a]).

5. PARENT AND CHILD — CHILD CUSTODY — PROBATE COURT — TERMINATION OF PARENTAL RIGHTS.

The standard to be applied by the probate court in proceedings to terminate parental rights pursuant to the juvenile code is whether the parents have been shown by clear and convincing evidence to be unfit and unable to become fit; the standard is not the best interest of the child standard used in circuit court child custody proceedings under the Child Custody Act (MCL 712A.19a; MSA 27.3178[598.19a]).

6. EVIDENCE — PSYCHIATRIST-PATIENT PRIVILEGE — APPEAL.

The failure to raise the psychiatrist-patient privilege at a hearing or at trial precludes the appellate consideration of a claim that the testimony of a psychiatrist was subject to such privilege (MCL 330.1750; MSA 14.800[750]).

7. EVIDENCE — PSYCHIATRIST-PATIENT PRIVILEGE — WAIVER.

A signed waiver being offered for the purpose of the psychiatrist-

patient provisions of the Mental Health Code need not be authenticated in the absence of a claim by the patient that the waiver was not executed (MCL 330.1750; MSA 14.800[750]).

8. EVIDENCE — PSYCHIATRIST-PATIENT PRIVILEGE — WAIVER.

　It is error to admit the testimony of a psychiatrist or psychologist over an objection based upon the psychiatrist-patient privilege contained in the Mental Health Code where there is no evidence of waiver, no evidence that the testimony fell within one of the statutory exceptions, and no evidence that the psychiatrist or psychologist met with the patient pursuant to the Child Protection Law (MCL 330.1750, 722.631; MSA 14.800[750], 25.248[11]).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Janis Meija* and *Bernard Rosner,* Assistants Attorney General, for petitioner.

*Kathleen M. Cummins,* for respondent.

Before: MACKENZIE, P.J., and BRONSON and BEASLEY, JJ.

BEASLEY, J. The Juvenile Division of the Wayne County Probate Court took temporary custody of three of the children of respondent, Patricia Atkins, pursuant to a neglect and/or dependency petition filed by the Wayne County Department of Social Services (DSS) on June 18, 1973. A second petition was filed on September 30, 1977, seeking to have the three children, who were then in foster care homes, made permanent wards of the court for purposes of adoption. After a hearing on the petition for permanent custody held in April and May, 1979, the juvenile court took permanent custody of Jeffrey Samuel Atkins, Lisa Michelle Atkins and James Joseph Atkins, making them permanent wards of the court for purposes of adoption. The circuit court on appeal upheld the

probate court's decision. Respondent now appeals by leave granted.

The permanent custody petition filed by the DSS was based on the following provisions of MCL 712A.19a; MSA 27.3178(598.19a):

"Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the child in the permanent custody of the court, if it finds any of the following:

* * *

"(c) A parent or guardian of the child is unable to provide proper care and custody for a period in excess of 2 years because of a mental deficiency or mental illness, without a reasonable expectation that the parent will be able to assume care and custody of the child within a reasonable length of time considering the age of the child.

* * *

"(f) The child has been in foster care in the temporary custody of the court on the basis of a neglect petition for a period of at least 2 years and upon rehearing the parents fail to establish a reasonable probability that they will be able to reestablish a proper home for the child within the following 12 months."

Respondent's first claim is that the DSS failed to meet its burden of proof by clear and convincing evidence and that permanent custody by the court was not warranted on the basis of neglect. It should be noted, however, that permanent custody was not sought under subsection 19a(e), which provides:

"The parent or guardian is unable to provide a fit home for the child by reason of neglect."

Subsection 19a(f) does not require a finding of neglect. Rather, it requires a finding as to whether there is a "reasonable probability" that the parents will be able to "reestablish a proper home" for a child who has been in foster care in the temporary custody of the court for at least two years based on a *prior* neglect petition. Respondent's first issue, thus, appears to be a challenge to the initial finding of neglect made after a hearing on the temporary custody petition filed under MCL 712A.2; MSA 27.3178(598.2). Since respondent did not challenge this initial finding of neglect in her appeal to the circuit court and did not file a transcript of the first hearing with this Court, we are unable to review this issue on appeal.[1]

Respondent also claims that the DSS failed to meet its burden of proof that permament custody by the court was warranted on the basis of mental illness under subsection 19a(c). Nine witnesses, including respondent, testified that she had five children, one of whom, Rebecca, was presently living with her. Her daughter Jennifer was in legal guardianship and the three oldest children (the subjects of this case), were in foster care. Respondent had had problems since her teenage years. She became depressed when her mother died in 1962, and sought help at the Lafayette Clinic when she was 15 years old. She voluntarily signed herself in and stayed for two or three months.

Respondent went again to the clinic in 1970, voluntarily placing Lisa and Jeffrey in foster care. She had married Samuel Atkins in 1966, living with him off and on for a year. She admitted that she had gotten involved with marijuana, alcohol,

---

[1] See *In the Matter of Adrianson,* 105 Mich App 300, 309; 306 NW2d 487 (1981).

tranquilizers, and cocaine at the age of 21, but claimed that she had stopped taking any drugs or alcohol a year and a half prior to the hearing.

In 1971, respondent sought counseling at Family Services in Dearborn, which in-home counseling continued for about seven months. In the spring of 1970 or 1971, respondent had gotten custody of Lisa and Jeffrey and kept them for a year and a half. At the time, she was living with a man who was on drugs. A third child, James, was born in July, 1972. Respondent herself was on marijuana and alcohol, was depressed and wanted to go to a hospital. In late 1972, she took Lisa, Jeffrey, and James to the police station because she felt she was in immediate danger and needed some place to put the children. Respondent spent four or five months in the Lafayette Clinic and then lived in adult foster care homes for a year and nine months. Since 1972, respondent had gotten custody again of only Jeffrey, who lived with her for about six months in the spring of 1976.

While Jeffrey and Jennifer were with her in 1976, respondent was renting a house but was having financial problems. Her landlady and her aunt told her to adopt out James and Jennifer and then she could get Jeffrey and Lisa back. Respondent, who had become religiously reborn, was in Alcoholics Anonymous at the time but was still drinking. One day, when she was arguing with Mrs. Sturtos, respondent, who was "loaded" on alcohol, blacked out for five minutes and then left the house with Jeffrey. The police came, took Jeffrey and brought respondent to Northville State Hospital, where she stayed for two or three months.

In 1974, the probate court took temporary custody of Jeffrey, Lisa and James on a neglect peti-

tion. After the court took custody of the children, respondent worked and went to school for a while, until she got pregnant. At the time of the permanent custody hearing, respondent was living with her 11-month-old daughter, Rebecca, and was supported by ADC. Respondent testified that she would still get "sort of depressed", but it would not be as devastating a depression as before. Respondent also admitted that her drug and alcohol problems, which necessitated her separation from her children, had a negative emotional impact on her son Jeffrey. However, she did not believe she needed any further treatment for drug or emotional problems.

Respondent's son James had been in foster care for six of his seven years. Respondent had been unable to see him on a "real parent-child relationship basis" for a number of years. The last time she saw James was in 1975 or 1976.

Dr. Judith Kleinman, a psychiatrist who had interviewed respondent in May of 1977, testified that respondent exhibited characteristic responses of a schizophrenic. Respondent became increasingly agitated after the doctor administered a mental status examination and abruptly ended the interview by saying that she could not stand being in the office any longer. Dr. Kleinman diagnosed respondent as psychotic, with auditory hallucinations and paranoid delusions.

The doctor examined Jeffrey and concluded that he was a multiple-traumatized and depressed child and would not benefit from being returned to his mother. Lisa had also suffered emotionally from the multiple placements and separations and could not be successfully reunited with her mother. James had been severely traumatized as an infant and still showed significant emotional scars.

Barbara Walkenhorst, who had befriended respondent between October, 1976, and March, 1977, testified that she and another woman, Jennie Porter, had done their best to help respondent become independent in order to regain custody of her children but respondent was either unwilling or unable to improve her status. Walkenhorst said that respondent was not a truthful person and that she would not believe her if she were under oath. She described respondent's house as "totalled" each of the three times she had visited but that it was liveable.

John Derr, who had a master's degree in psychology, met with respondent in December, 1975, on a referral from the DSS. He had diagnosed respondent as being a dependent personality who would need a lot of support and guidance if under stress and recommended that the children be made temporary wards of the court. However, he found no evidence of a thinking disorder or of schizophrenia and, on cross-examination, testified that if there were no serious losses of a loved one and no severe financial insecurity, it would be possible for a person in her condition to function in a relatively normal way.

Virginia Porter testified that she had known respondent from November, 1976, until March, 1977, and that respondent had lived with her during part of that time. She testified that respondent began to make personal attacks on her and that she finally had to move respondent out and into a hotel room. Porter did not believe that respondent was a truthful person.

Dr. George Czertko, a psychiatrist and director of the Department of Substance Abuse at Lafayette Clinic, testified that he treated respondent from September 13, 1973, to December 31, 1973, as

an in-patient resident at the Lafayette Clinic. Dr. Czertko conducted a standardized mental status examination and took a psychiatric history. He found respondent to be depressed and that she felt she was unable to function in her capacity as a mother and as a housewife. He had diagnosed respondent's condition at the time as that of re-active depression secondary to a chronic personality disorder. His final diagnosis was that of a borderline personality, which means a person who has extreme difficulties in maintaining relationships with people, with periodic loss of contact with reality. Dr. Czertko's last contact with respondent was on November 12, 1974. He testified that the prognosis for a person with her problems was extremely poor without treatment. Dr. Czertko said he would be most surprised if respondent would be able to take care of herself, let alone her children, without any treatment. While at the clinic, respondent was helped in obtaining a waitress job two blocks away. Despite being taken to work and back by a staff person, respondent lost the job.

Deborah Morgan, a foster care worker with the DSS, testified that she first met with respondent on October 16, 1978. Morgan had set up visits for respondent with her son James in October, 1978, and January, 1979, but respondent cancelled both times. According to Morgan, respondent regularly visits her son Jeffrey and visited Lisa two weeks before Christmas in 1978.

Mary Larson, who had met respondent eight months before trial, testified that she became ac-quainted with respondent when the latter called the prayer line at the Evangelical Church. Respon-dent sought Larson's help in eventually obtaining custody of her children through a plan whereby

Larson was to take temporary legal guardianship of Jeffrey and James. Larson agreed to help respondent if respondent would go to church. Respondent was not cooperative regarding the plan in that she would not attend church. At some point, Larson backed out of the guardianship plan, evoking anger in respondent, who accused Larson of wanting respondent's children for her own.

Susan Shandorf, a social worker with the DSS, had been assigned respondent's case in early 1974. Respondent had submitted five or six plans over a period of time extending from September, 1974, through December, 1978, to obtain custody of her children. Only one of the plans, which was submitted in April, 1976, was acceptable. Respondent was granted a trial return of her oldest child, Jeffrey, under supervision of the DSS. The arrangement lasted about five months and was terminated when respondent began to experience emotional problems and was admitted to Northville State Hospital.

According to Shandorf, Jeffrey had been in eight foster placements and such a high number of placements was unhealthy for Jeffrey. Respondent was absent from the proceedings for one whole day, came late to the proceedings the third day and did not return to court after breaking for lunch the third day, when she had been scheduled to continue her testimony after lunch. Respondent was not present on the fourth day of the proceedings.

We believe that the above testimony presented at the hearing was sufficient to support a finding under either subsection 19a(c) or 19a(f). The finder of fact could find, based on this evidence, that there was clear and convincing proof that respondent was not fit as a parent and was unable to

become fit within a reasonable period of time based on her history of mental illness and inability to function consistently as a parent.

We reject respondent's contention that subsection 19a(c) violates equal protection by predicating a family relationship on mental illness alone. Subsection 19a(c) does not allow termination of parental rights simply on the basis of mental illness. Rather, it links the parent's mental illness to that parent's ability to provide proper care for her child. Therefore, it is unnecessary to determine whether there is a rational basis for classifying all mentally ill persons as being unfit to retain custody of their children.[2]

Respondent also challenges the legal standards applied by the probate judge. The probate judge, in his opinion, stated:

"This court has highlighted some of the testimony in this matter and after reviewing all of the testimony finds that no realistic plan has been advanced through counsel for Mrs. Atkins to persuade this court that it is in the best interests of the children to return them to Mrs. Atkins. Each of these children has been in foster care in the temporary custody of this court for at least 2 years and there has not been established on this record a reasonable probability that Mrs. Atkins would be able to re-establish a proper home for the children within the following 12-month period. The medical testimony offered in this court shows at least an emotional or mental illness on the part of Mrs. Atkins which would not permit her to function in such manner as to meet the growing needs of the three children. There is clear and convincing evidence that it is in the best interests of the children that they be placed in a permanent home."

Respondent claims that the probate judge erred

---

[2] See *Doe v Oettle,* 97 Mich App 183, 186-187; 293 NW2d 760 (1980).

in placing the burden of proof upon her to prove fitness. In a custody termination case, under §§ 19 and 19a, the burden of going forward is placed upon the parent. However, as this Court noted in *In the Matter of LaFlure*,[3] this burden is not the same as the burden of proof:

"We do not think it inappropriate that the burden of going forward be placed on the parents. Such a burden is far less onerous than the burden of proof. It merely requires the parents to give any indication whatsoever that the family situation has improved."

The following interchange between the probate judge and counsel for petitioner made during closing statements indicates that the probate judge did understand that the burden of proof was on the petitioner:

"*The Court:* Well, the burden of proof does not shift to the respondent in this cause.
"*Mr. Rosner:* Pardon, your Honor.
"*The Court:* The burden of proof on your petition does not shift to the respondent in this cause."

Thus, while some of the wording used in the judge's opinion, standing alone, might tend to indicate that he improperly shifted the burden of proof to respondent, it is clear that he understood the proper standard and found by clear and convincing evidence that the statutory requirements for termination of parental rights under subsection 19a(c) and 19a(f) of the statute were met.

Respondent claims also that the probate judge erred reversibly in applying the "best interests of the child" standard in making his determination. The "best interests" standard has its statutory

---

[3] 48 Mich App 377, 388; 210 NW2d 482 (1973).

origin in the Child Custody Act of 1970,[4] which applies to all actions in circuit court involving a dispute of custody over a minor child. This act, however, does not apply here, where the matter of the custody is in the probate court.[5]

Although some panels of this Court have implied that the "best interest" standard should be applied in at least some stages of proceedings to terminate parental rights under MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.,*[6] we believe that the proper standard for proceedings under § 19a is whether the parent has been shown by clear and convincing evidence to be unfit and unable to become fit within a reasonable period of time.[7]

As the Supreme Court stated in *Fritts v Krugh:*[8]

"It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and the question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered the children."

While the probate judge in the present case did refer to the "best interests" standard in his opinion, this case does not mandate reversal where he did not weigh the advantages of the foster homes of respondent's children against what respondent could provide and where he did base his decision

---

[4] MCL 722.21 *et seq.;* MSA 25.312(1) *et seq.*

[5] *In re Weldon,* 397 Mich 225, 264, 326-327; 244 NW2d 827 (1976) (opinions of COLEMAN, J., and LEVIN, J.), custody decision affirmed, retention of jurisdiction vacated 407 Mich 1152 (1979).

[6] *In the Matter of Baby X,* 97 Mich App 111; 293 NW2d 736 (1980), *In the Matter of Rebecca Oakes,* 53 Mich App 629; 220 NW2d 188 (1974), *In re Franzel,* 24 Mich App 371; 180 NW2d 375 (1970).

[7] *In the Matter of LaFlure, supra,* MCL 712A.19a; MSA 27.3178(598.19a).

[8] 354 Mich 97, 115; 92 NW2d 604 (1958).

on respondent's fitness under the standards of subsections 19a(c) and 19a(f) of the statute.

Respondent's final claim on appeal is that the decision of the circuit court, upholding the probate court's admission of testimony allegedly protected by the psychologist/psychiatrist-patient privilege, was clearly erroneous. Respondent claims this error occurred in regard to admission of the testimony of Dr. Judith Kleinman, John Derr and Dr. George Czertko.

The testimony of Dr. Kleinman was received without objection at the hearing. Therefore, any claim regarding the admissibility of her testimony was not preserved for appeal.

In regard to the testimony of Dr. Czertko, evidence of a signed waiver was presented by petitioner at the hearing. Respondent's attorney argued that the waiver was not properly authenticated. Respondent was absent, without excuse, at the time that the document was presented. Faced with this situation, the probate judge admitted the waiver subject to its being challenged at any time respondent was present and wished to do so. There appears nowhere on the record any claim by respondent that she did not execute the waiver. We find that the probate court did not commit reversible error in admitting the Czertko testimony.

The testimony of John Derr, a psychologist, was received over objection. No evidence was presented that respondent had waived the privilege or had been informed at the time of her meeting with Derr that any communications made would not be privileged. Thus, it was error to admit this testimony under MCL 330.1750(2); MSA 14.800(750)(2), which provides:

"(2) Privileged communications shall not be disclosed in civil, criminal, legislative, or administrative cases or

proceedings, or in proceedings preliminary to such cases or proceedings, unless the patient has waived the privilege, except in the circumstances set forth in this section."

Absent an indication that respondent had been informed that communications with Derr would not be privileged, this testimony was not made admissible by the exception to the above-quoted provision made in MCL 330.1750(3)(e); MSA 14.800(750)(3)(e), which states:

"(3) Privileged communications shall be disclosed upon request:

* * *

"(e) When the communications were made during an examination ordered by a court, prior to which the patient was informed that any communications made would not be privileged, but only with respect to the particular purpose for which the examination was ordered."

Neither do we find that the psychologist-patient privilege was waived by MCL 722.631; MSA 25.248(11), as that section only abrogates the privilege as to evidence introduced in a civil child protective proceeding resulting from a report made pursuant to the Child Protection Law. There is no indication that Derr's meeting with respondent was a result of any action made under the Child Protection Law.

While we find Derr's testimony to have been erroneously admitted, we also find that this error was harmless. There was other overwhelming evidence supporting the trial judge's findings. Moreover, the testimony of this witness was not especially damaging to respondent, as he admitted that, under proper circumstances, she could function in a relatively normal way.

Affirmed.