**In the Matter of the Termination of the Parental Rights of Jeremy Randall DULL and Rebecca Lynn Dull and Their Parents Orville and Helen Dull.**

**Orville DULL and Helen Dull, Appellants (Respondents),**

**v.**

**DELAWARE COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee (Petitioner).**

**No. 18A02–8705–CV–00200.**

Court of Appeals of Indiana, Second District.

April 21, 1988.

Dennis K. Frick, Legal Services Organization of Indiana, Inc., Indianapolis, Thomas L. Gilmore, East Central Legal Services Program, Anderson, for appellants.

Donald H. Dunnuck, Chris M. Teagle, Muncie, for appellee.

BUCHANAN, Judge.

## CASE SUMMARY

Respondents-appellants Orville Dull (Orville) and Helen Dull (Helen) [hereinafter collectively referred to as the Dulls] appeal from the trial court's judgment terminating their parental rights in their minor children, Jeremy Randall Dull (Jeremy) and Rebecca Lynn Dull (Rebecca) [hereinafter collectively referred to as the children].

We affirm.

## FACTS

Jeremy, born July 15, 1978 and Rebecca, born December 30, 1982 were removed from the Dulls' custody on February 8, 1985. Helen and Orville are mildly retarded with I.Q.'s of 62 and 72, respectively. Both experienced substantial difficulty in learning, self-direction, and socialization skills. Jeremy and Rebecca were declared children in need of services [1] on July 1, 1985, and a dispositional decree was entered on December 10, 1985. Supervised court-ordered services were provided to the Dulls by the Delaware County Department of Public Welfare (DPW) which included full-time day care services for Rebecca, nutrition instruction, family and mental health counseling services, and parent consultation.

On October 20, 1986, the DPW petitioned to terminate the Dulls' parental rights. Following a hearing on the petition, the trial court entered judgment terminating the parent-child relationship of the Dulls and their children on February 11, 1987, and made the following findings:

## "FINDINGS OF FACT

1. That the minor children Jeremy Dull, born July 15, 1978 and Rebecca Dull, born December 30, 1982 are the biological children of Orville and Helen Dull.

2. That on the 1st day of July, 1985, Jeremy Dull and Rebecca Dull were declared Children in Need of Services in accordance with Indiana Code 31–6–4–3(a)(1).

3. That on the 8th day of February, 1985, said children, Jeremy Dull and Rebecca Dull, were placed in a licensed foster home. That said children have been removed from the parents under a dispositional decree, and said children have been removed from the parents' custody in excess of six months under said dispositional order.

4. That Orville Dull and Helen Dull lack appropriate parenting skills, which is demonstrated by disregard of positive attention towards their children, lack of demonstration of physical and emotional nuturing [sic] and neglect of the children's welfare which has been detrimental to Jeremy Dull and Rebecca Dull's growth and development resulting in significant development, emotional and social delays prior to their removal, and that said conditions will continue to exist if the children were to reside with their parents, to-wit; Orville Dull and Helen Dull, and could not be rectified; to-wit:

a. Orville Dull has been diagnosed as being retarded intellectually with an I.Q. of 72 showing substantial handicap in the following areas of Major Life Activity: learning, self-direction, and socialization, and current data suggests his condition can be expected to continue for the forseeable [sic] future. Helen Dull has also been diagnosed as being intellectually retarded showing substantial handicap in Major Life Activity with an I.Q. of 62, and her condition is expected to continue for the foreseeable future.

b. Jeremy Dull's developmental delays at the time of removal were in such areas as: emotional, he is/was labeled as emotionally disturbed, social, academic, fine motor and speech. However, he has made significant progress since removal from his parents, Orville and Helen Dull.

1. Ind.Code 31–6–4–3(a)(1) (Supp.1987).

c. Rebecca Dull's developmental delays, before removal on October 4, 1984, were in all areas assessed by Hillcroft. These areas include gross motor, fine motor, cognitive, language, self-help, and social/emotional skills. However, she has made significant progress since her removal from her parents and is now at normal levels for her age.

5. That there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied in that the following services were offered by Petitioner to Orville and Helen Dull, to-wit:

a. Full-time day care services for Rebecca Dull through Downtown Day Care Center;

b. Home Start Program through Hillcroft;

c. Mental Health and Family Counseling Services;

d. Homemaker Services through Department of Public Welfare and Open Door Community Services;

e. Nutritional Counseling through County Extension Program;

f. Weekly home visits from the Visiting Nurse and Social Worker from the Visiting Nurse Association;

g. Participation in parenting consultation through United Day Care;

h. Supervision through the Delaware County Department of Public Welfare.

Said services were not continued as there were no improvements of a degree sufficient enough to warrant continuing these services.

Further, the failure of Orville and Helen Dull to benefit from said services was the result of their innate inability to comprehend and/or retain parenting skills from said services which inability is caused by their mental and social handicap.

6. That it is in the best interests of the minor children herein and their health, welfare and future, that the parent-child relationship, including all legal rights, privileges, duties, and obligations, including rights of inheritance between said children and their parents be forever fully and absolutely terminated.

7. That the Delaware County Department of Public Welfare has a satisfactory plan for the care and treatment of the children, in that it is the intent of the Delaware Department of Public Welfare to place the children up for adoption.

CONCLUSIONS OF LAW

1. The fact that the parents' mental/social deficiencies will not in all likelihood improve, justifies the finding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied....

2. The evidence that the children's condition (i.e. mental/social well being) has improved dramatically since removal shows that termination is in the best interests of the children....

3. The Court must subordinate the interests of the parents to those for the children in such a proceeding as the matter before the Court ...

4. That based upon the foregoing, the parent-child relationship of Jeremy Randall Dull and Rebecca Lynn Dull and their parents, Orville Dull and Helen Dull should [be] terminated."

*Record* at 59-62.

## ISSUES

The Dulls present the following issues for review:

1. Whether the trial court's judgment terminating the Dulls' parental rights was supported by sufficient evidence?

2. Did the trial court properly consider the low intelligence levels of the Dulls as a factor in deciding whether to terminate their parental rights?

## DECISION

ISSUE ONE—Was the trial court's judgment terminating the Dulls' parental rights supported by sufficient evidence?

PARTIES' CONTENTIONS—The Dulls argue that the evidence was insufficient to support the findings that the children's developmental delays were caused by the

Dulls and would not have been remedied had Jeremy and Rebecca remained in the household.

The DPW responds that the evidence was sufficient to support the termination of the Dulls' parental rights.

CONCLUSION—The evidence sufficiently supported the trial court's findings that Jeremy's and Rebecca's developmental delays were caused by their parents and that those problems would recur if the children were returned to the home.

■ Because the Dulls filed a request for findings of fact and conclusions of law as permitted by Indiana Rules of Procedure, Trial Rule 52(A), this court cannot affirm the trial court's judgment on any ground which the evidence might support. Rather, we must determine whether the specific findings are adequate to support the trial court's decision. *Orkin Exterminating Co. v. Walters* (1984), Ind.App., 466 N.E.2d 55, *trans. denied; National Fleet Supply, Inc. v. Fairchild* (1983), Ind.App., 450 N.E.2d 1015; *Shrum v. Dalton* (1982), Ind.App., 442 N.E.2d 366. We may not reweigh the evidence or judge the credibility of the witnesses; we may consider only the evidence most favorable to the judgment. *J.K.C. v. Fountain County Dep't of Pub. Welfare* (1984), Ind.App., 470 N.E.2d 88.

Parental rights are not lightly terminated. In order for parental rights to be lost the following conditions must be supported by clear and convincing evidence:

"(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) termination is in the best interests of the child; and

(4) the county department has a satisfactory plan for the care and treatment of the child."

IC 31–6–5–4 (Supp.1987).

■ Although the Dulls maintain that there was not clear and convincing evidence to support the findings that Jeremy's and Rebecca's developmental delays were caused by the Dulls and would persist if the children were returned to them, the evidence and the specific findings contained in paragraphs 4.b and 4.c of the trial court's entry do support this finding.

At the January 21, 1987 hearing, DPW caseworker Jean Wright (Wright) testified that she first contacted the Dulls in 1984. She observed that the house was filthy and that the Dulls could not control Jeremy's behavior. *Record* at 217–18. She determined that the Dulls relationship with Jeremy was one of "child to child" rather than parent to child. *Record* at 223. Following the children's removal from the Dull household in February 1985, Wright found that the Dulls' house remained dirty and that Jeremy and Rebecca were always anxious to return to their foster parents when visiting the Dulls because there was little interaction between Jeremy and Rebecca and their parents. *Record* at 223–24. Other DPW witnesses acknowledged the Dulls' continuing difficulty with essential parenting skills including food preparation, budgeting, and cleanliness even after they attended counseling sessions. *Record* at 27, 179, 206, 208–10, 224.

Beginning in May, 1986, Donna Davidson (Davidson), a clinical psychologist, worked with Jeremy and Rebecca. She found that Jeremy was emotionally disturbed. He masturbated excessively, chewed holes in linens, tore up furniture, and ate profusely. *Record* at 165. Jeremy matched the intellectual development of his parents and they were unable to control his hyperactivity. Davidson concluded that Jeremy needed constant attention, supervision, and a very structured environment which his parents could not provide. *Record* at 153–54, 165–67.

Linda Strunk, an Infant Stimulation Program employee, began working with the Dulls when Rebecca was twenty-one months old. She determined that Rebecca was developmentally delayed in all areas of emotional growth and made virtually no progress while living with her parents. *Record* at 245, 248. The Dulls did attend court-ordered classes, but were unable to

comprehend and learn basic parenting skills. *Record* at 179, 206. Following Jeremy's and Rebecca's removal from the household, Jeremy became less hyperactive and could be more easily disciplined. *Record* at 198. Rebecca became a normal, healthy child for her age. *Record* at 164–65.

Thus we conclude the evidence sufficiently supports the trial court's findings that the Dulls lacked the skills necessary to raise their children properly, thereby inhibiting the children's development. Further, this inability to improve their skills supports the trial court's decision that those conditions would not be remedied. *See D.H. v. Bartholomew County Dep't of Pub. Welfare* (1984), Ind.App., 468 N.E.2d 542, *trans. denied* (evidence was sufficient to terminate parental rights when social agencies were unsuccessful in their attempts to upgrade mother's parenting skills to an acceptable level).

ISSUE TWO—Did the trial court properly consider the Dulls' low intelligence levels as a factor in deciding whether to terminate their parental rights?

PARTIES' CONTENTIONS—The Dulls maintain that mental retardation should not be considered in deciding whether to terminate a parent-child relationship.

■ The DPW asserts that mental retardation is a relevant factor in determining whether parental rights should be terminated and point to cases in other jurisdictions.

CONCLUSION—The trial court properly considered the Dulls' mental retardation as a factor in deciding whether or not to terminate their parental rights.

Being without the wisdom of relevant decided cases in Indiana, we turn to other jurisdictions that have decided the question. We find that retardation of a parent *by itself* is not a ground for termination of parental rights. *Helvey v. Rednour* (1980), 86 Ill.App.3d 154, 41 Ill.Dec. 671, 408 N.E. 2d 17; *Adoption of Abigail* (1986), 23 Mass.App.Ct. 191, 499 N.E.2d 1234; *In re Atkins* (1982), 112 Mich.App. 528, 316 N.W.

2d 477; *In re J.L.B.* (1979), 182 Mont. 100, 594 P.2d 1127.

The majority of jurisdictions recognize that while an adjudication of a parent's mental retardation will not alone render that parent unfit, "evidence of such adjudication may be considered, along with all other pertinent evidence bearing upon the question of that parent's fitness." *Helvey, supra,* 86 Ill.App.3d at 161, 41 Ill.Dec. at 676, 408 N.E.2d at 22; *see also In re Atkins, supra; In re J.L.B., supra; In re Montgomery* (1984), 311 N.C. 101, 316 S.E.2d 246; Annot., 22 *A.L.R.4th* 774 (1983); 43 C.J.S. *Infants* § 40 (1978) and cases cited therein.

For example in *In re J.L.B., supra,* the Montana Supreme Court declared:

> "*[M]ental deficiencies alone do not justify termination if there is no evidence that the child is in some way harmed or likely to be harmed because of the parent's condition. ...*
>
> In the present case the District Court found that the child was harmed by her mother's failure to provide adequate emotional support, and concluded that the mother was 'incompetent to face and handle the problems presented to parents by children in their advancing years.' *... [T]he District Court's conclusion that the child was harmed by her home environment is supported by the testimony of social workers, physicians, and psychologists.*"

*Id.* 182 Mont. at 116, 594 P.2d at 1136 (emphasis supplied).

The evidence does not support the Dulls' contention that their parental rights were terminated solely because of their mental retardation. To the contrary, while the trial court found that Orville and Helen were mildly mentally retarded, the evidence, as discussed in Issue I, *supra,* clearly demonstrated the Dulls could not provide Jeremy or Rebecca with the necessary home environment which would allow them to develop without severe developmental delays accompanied by emotional disturbances.

DPW witnesses also testified that nothing further could be done to remedy the

Dulls' inadequate parenting skills. *Record* at 179, 210, 224.

Although the Dulls' incapacity to provide properly for Jeremy's and Rebecca's emotional development was necessarily linked to the finding of mental retardation, their continued inability to provide for the children's well-being was clearly demonstrated by the testimony of DPW caseworkers, psychologists, and family counselors, as set forth in Issue One. Thus, we conclude that the trial court's consideration of the parents' low intelligence levels, along with the other evidence presented at trial, supports the finding that the requirements of IC 31–6–5–4 were satisfied.

Judgment affirmed.

RATLIFF, C.J., concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

I dissent.

The judgment of the trial court and the decision of the majority herein rest clearly and simply upon the premise that the children will be better off as wards of the governmental bureaucracy or in a foster home.

Not only is the evidence in support of the judgment less than "clear and convincing," it does not even approximate a preponderance in favor of the Welfare Department.

As stated in *In re J.H.* (1984) 1st Dist. Ind.App., 468 N.E.2d 542, 546, quoting *In re Miedl* (1981) Ind., 425 N.E.2d 137, 141:

"Children are not taken from the custody of their parents because there is a better or the 'best' place for them. They are taken because the present place in the custody of their parents is wholly inadequate for their very survival. Before a court can do anything with regard to the future of the children, it must first be found that the circumstances are such that the parental tie must be severed and a different direction found that gives some chance to the child or children."

The decision today constitutes an unwarranted and very real threat to every parent who feeds, clothes, shelters and loves his child, but happens to be intellectually and economically less well endowed than is acceptable to those of us who work within governmental social agencies and judicial systems.

Would that I had the skill and the erudition to dissent in stronger terms.