**Walter EGLY and Diana Egly,
Appellant (Respondent),**

v.

**BLACKFORD COUNTY DEPARTMENT
OF PUBLIC WELFARE, Appellee
(Petitioner).**

No. 05A02–9003–CV–174.

Court of Appeals of Indiana,
Second District.

July 23, 1991.

Thomas A. Brown, Hartford City, for appellant.

William E. Ervin, Hartford City, for appellee.

BUCHANAN, Judge.

### CASE SUMMARY

Petitioners-appellants Walter Egly (Walter) and Diana Egly (Diana) (also collectively referred to as "the Eglys") appeal the termination of their parental rights over their two children, Walter Lee Egly, Jr. (Walter Jr.) and Matthew Egly (Matthew), claiming that the evidence was insufficient to support the judgment and that the Blackford County Department of Public Welfare (Department) should be estopped from bringing an action to terminate parental rights before the expiration of Eglys' contract for services with the Department.

We reverse.

### FACTS

The facts which support the court's judgment show that in November of 1987, complaints regarding the living conditions at the Eglys' home were made to the Department. Linda Miller (Miller) a case worker with the Department, visited the Eglys' trailer home and discovered holes in the floor of the trailer, no water, that the furnace did not work properly, and a kerosene heater spewing fumes throughout the house.

As a result of this investigation, Walter Jr. and Matthew were temporarily removed from the home and made wards of the State.[1] Deborah Slater (Slater), a Department caseworker, began to work with Walter and Diana to help them establish a better home environment for the children. Slater counseled the Eglys regarding budgeting, homemaking, supervised visitation and provided transportation for the Eglys

---

1. The Eglys seem to complain that this temporary removal was done without due process. However, as the issue at trial and on appeal concerns the permanent termination of the Eglys' parental rights, we will confine our discussion to that issue.

to and from the Grant County Developmental Center so they could attend parenting classes. The Eglys entered into a contract for services on December 15, 1987, and before Christmas of 1987, Walter Jr. and Matthew, were returned to the Egly home.

During their removal from the home and in subsequent follow-up visits, Department workers observed problems with the Egly children. Walter Jr., who was nearly four years old in December of 1987, had not been toilet-trained. Matthew, who was about nine months old at the time, was usually confined to a crib during Department visits and had not sufficiently developed his motor skills. Counselors also concluded that both children were socially deprived. Walter Jr., who was mildly retarded, had difficulty learning and had a speech problem in which he repeated everything he heard.

The two children were again temporarily removed from the home and placed in foster care. While in foster care, Walter, Jr. became toilet-trained in two weeks. Walter Jr.'s communication problems improved and both became, according to Department workers, more socially active.

Although the Department continued to work with the Eglys to improve their parenting skills, caseworkers eventually concluded that Diana, who had an IQ of fifty-seven, and Walter, who had an IQ of seventy-three, did not have the mental capability to comprehend and retain the information given them. Kenneth Joy, a psychologist who examined Walter and Diana, determined that Walter lacked the desire to be a more successful parent and was more motivated by economic concerns. Joy diagnosed Walter as having a personality disorder which made him resistant to change, which problem could only be overcome through long-term in-patient treatment.

The Eglys entered into a second contract for services with the Department on June 29, 1988, and another one on February 13, 1989. Two months into the third and final contract, the Department petitioned the

Blackford Circuit Court to terminate the Eglys' parental rights over Walter Jr., Matthew, and Joseph Egly.[2] Following a trial held on October 26 and 27, 1989, the court granted the Department's petition.

## ISSUE

The Eglys now appeal and raise four issues, which we consolidate into one:

Whether there was clear and convincing evidence to support the termination of the Eglys' parental rights over their children?

## DECISION

PARTIES' CONTENTIONS—The Eglys argue that there is not clear and convincing evidence to support the termination of their parental rights and claim that the court's order constitutes an unwarranted interference into the family. The Department responds that there was sufficient evidence introduced showing the Eglys were unfit parents incapable of learning parental skills and failed to provide a proper social and educational environment for their children. As a result, the Department claims, the Egly children were socially deprived and would be better off living in a foster or adoptive home.

CONCLUSION—The evidence is not sufficiently clear and convincing to support termination of parental rights.

The time-honored right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; *Meyer v. Nebraska* (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. The right to raise one's children has been recognized to be one of "the basic civil rights of man." *Skinner v. Oklahoma* (1942), 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655.

However, there are circumstances in which the constitutional right to raise one's children must be subordinated to the need

**2.** The Eglys have not appealed the termination of parental rights to Joseph who was a product of a previous marriage between Walter and his first wife, and who was living in a foster home at the time of the trial.

to protect the health, welfare and safety of the children. In establishing such circumstances, the legislature has provided that four separate requirements must be proven by clear and convincing evidence:

"(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

(A) the conditions that resulted in the child's removal will not be remedied; or

(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child."

Ind.Code 31-6-5-4 (1990).

In *Matter of Miedl* (1981), Ind., 425 N.E.2d 137 our supreme court clarified how the "best interest" requirement is to be interpreted and applied in a parental termination proceeding:

"Children are not taken from the custody of their parents because there is a better or the 'best' place for them. *They are taken because the present place in the custody of their parents is wholly inadequate for their very survival.* Before a court can do anything with regard to the future of the children, it must first be found that the parental tie must be severed and a different direction found that gives some chance to the child or children."

*Id.* at 141. (emphasis supplied); *See also Matter of J.K.C.* (1984), Ind.App., 470 N.E.2d 88; *Matter of J.H* (1984), Ind.App., 468 N.E.2d 542, *trans denied.*

■ The parents in this case, Walter and Diana, are mentally retarded. *Record* at 209–10. While mental retardation cannot, in and of itself, be a ground for terminating parental rights, it may be considered as a factor if there are other reasons which would support the termination decision. *Dull v. Delaware County Dep't of Public Welfare* (1988), Ind.App., 521 N.E.2d 972.

■ The "other reasons" testified to by the Department's witnesses included a number of observations about the effect that the Eglys' retardation had on the social development of their children. Slater testified that the "processing skills" of Walter, Jr. were inadequate and that he couldn't function as a "normal" kindergartener. *Record* at 154. Rhonda Bright (Bright), a pre-school instructor, testified that Walter, Jr. didn't "play appropriately" and had to be taught how to "commune with toys." *Record* at 158. She also observed that Walter, Jr. "couldn't process information appropriately" and "didn't relate well ... when he was placed in a new situation ... [because] he was really awkward and very shy ..." *Record* at 159. Bright also offered the opinion that Walter Jr. was "socially deprived." *Record* at 157–58. Lois Bartley, an instructor for the parenting classes the Eglys attended, concluded that there was not a "bonding relationship" between the Eglys and Walter, Jr. *Record* at 182. Joy, who met the children during a brief visit to the home, concluded that they had "developmental deficits." *Record* at 214.

While the specific facts relied upon for these conclusions are not necessarily apparent from the record, nonetheless, the conclusions are, even if accurate, not of a serious enough nature to warrant termination of the Eglys' parental rights over their children, rights which are fundamental in nature and cloaked with constitutional protection. *See Pierce, supra; Meyer, supra; Skinner, supra.*

The Department offers additional evidence such as the fact that the Eglys had difficulty toilet-training Walter, Jr., *record* at 65–66, 116, 155, who was nearly four years at the time and himself slightly mentally retarded. The Department also points to testimony that Walter, Jr. had a speech problem, *record* at 131, that Matthew was not removed from the crib often enough by the Eglys, *record* at 120–21, 213, and that the Eglys' trailer home was in bad shape and in need of repairs. *Record* at 47, 116.

Although these allegations are more substantive in nature, we observe that the

Eglys were able to resolve these problems with the assistance of Department workers, family and friends. *Record* at 58, 123, 131. We cannot conclude that the problems were so serious in nature as to justify the extraordinary remedy of removing the Egly children based on speculation that these difficulties portend future child care problems that could threaten the very survival of the Egly children. *See Miedl, supra; See also J.K.C., supra; J.H., supra.*

Department caseworkers and counselors were united in their belief that adoption or a foster home would be a better social and educational environment for the children than that provided by Walter and Diana, who because of their "mental and social deficiencies," could not provide an enriching family life for their children. *Record* at 87; *See also record* at 79, 127–28. While this may be true, parental rights may not be terminated on the grounds that a better family environment exists for the children. *Miedl, supra; J.H, supra.* Parental rights are only to be severed when there is *clear and convincing proof* that "the custody of their parents is wholly inadequate for [the children's] very survival." *Miedl, supra* at 141; *See also J.H, supra.*

In *Dull,* a case that involved a similar factual situation to this case, i.e. retarded parents, children who were determined to have "developmental delays" because of their family environment, etc., we concluded that this clear and convincing standard had been met. In *Dull,* one of the children, an eight year old boy, was determined to be emotionally disturbed. He masturbated excessively, chewed holes in linens, tore up furniture, and ate profusely. *Dull, supra.* Department caseworkers concluded that the child was mentally disturbed, needed constant attention, supervision, and a very structured environment which the parents could not provide. *Id.* at 975. These facts show that the parent's continued custody would threaten the survival of the child and therefore met the *Miedl* standard.

In this case, the Department introduced no evidence that the survival of the Egly children was threatened by the continuance of the parental relationship.[3] Rather the evidence only shows that that the Eglys were mentally retarded and had difficulty with certain parental skills and that the Department thought the children would be better off in an adoptive or foster home. That is not a sufficient reason to terminate parental rights. *See Miedl, supra.*

We must conclude that the court erred in terminating the Eglys' parental rights over their children, Walter, Jr. and Matthew. *See Miedl, supra; J.H, supra.*

Judgment reversed.

SULLIVAN, J., concurs with opinion.

BAKER, J., dissents with opinion.

SULLIVAN, Judge, concurring.

I concur but in doing so do not retreat from the position taken in my dissent in *Dull v. Delaware County Department of Public Welfare* (1988) 2d Dist.Ind.App., 521 N.E.2d 972.

BAKER, Judge, dissenting.

I respectfully dissent. The majority appears to have used a different standard for the termination of parental rights for those parents with mental infirmities than that used for parents without such mental infirmities. Unfortunately, the casebooks are replete with challenges to the termination of a parent's rights, and often there is some failing on the part of the parent which allows the assignment of blame or fault to that parent. *See, e.g., Matter of Campbell* (1989), Ind.App., 534 N.E.2d 273; *Matter of D.L.W.* (1985), Ind.App., 485 N.E.2d 139; *Alexander v. LaPorte County Welfare Dep't* (1984), Ind.App., 465 N.E.2d 223. I acknowledge that the Eglys may be without blame or fault; however, reviewing courts should still employ the settled standard of review.

When reviewing a termination of parental rights, this court should not reweigh the evidence or judge the credibility of the wit-

---

3. We do observe that Joy testified that the Egly children would be "at risk" if placed back in the home. *Record* at 219. Joy's testimony, however, doesn't reveal how the Eglys' continued custody of their children threatened their survival.

nesses. We consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. *Matter of M.J.G.* (1989), Ind.App., 542 N.E.2d 1385. Viewing the evidence in this light, I am of the opinion that there was clear and convincing evidence to support the trial court's decision terminating the Eglys' parental rights.

I agree with the majority that mental retardation in and of itself cannot be a ground for terminating parental rights. *See Dull v. Delaware County Dep't of Public Welfare* (1988), Ind.App., 521 N.E.2d 972. A child cannot be taken away from parents simply on the basis of the parents' I.Q. scores. Had the Eglys' parental rights been terminated on this basis, I would agree the decision of the trial court should be reversed. That is not what occurred, however. There was evidence the Eglys were incapable of properly caring for their children, and incapable of learning how to care properly for the children.

As acknowledged by the majority, when the Eglys came to the attention of the Welfare Department, in part due to the deplorable conditions of their house, Walter, Jr., nearly four years old, was not yet toilet-trained and had a speech problem in that he repeated everything he heard. The Welfare Department began offering services to the Eglys. A social worker made regular visits to the Eglys' house. The younger child, Matthew, was always in his crib when the social worker came to the house, it did not appear that he had been out of the crib, he had little mobility skills and was unable to crawl at the age of 9–10 months.

There were other problems in addition to those cited by the majority. The Welfare Department arranged for Walter, Jr. to attend the Grant County Developmental Center. The Eglys would not consistently meet the bus that transported Walter, Jr. home from the Center, and he thus would at times be returned to the Center. After the children were removed from the home, the Eglys had visitation with them. The Eglys spent most of the time talking to the social service representative, and did not spend much time with the children. The social worker testified the Eglys were uncomfortable interacting with the children.

Walter, Jr. was toilet-trained within two weeks of his placement in a foster home, Matthew learned to crawl, and both children exhibited remarkable improvement in their vocabulary, educational skills, and interaction with others. All of the service providers eventually concluded the Eglys were not mentally or emotionally capable of raising the children. The Open Door Representative, a social worker who worked with the family for approximately a year and a half, testified the Eglys lacked the mental ability to provide proper parenting, and that additional counseling would not be helpful. The person in charge of the parenting classes attended by the Eglys testified the Eglys did not have the capacity to think much beyond what was on their minds at any given moment, that parent counseling was not helpful as the Eglys were incapable of remembering what they had learned in a session, and that they would forget what they had learned within ten to fifteen minutes. She indicated the Eglys lack the ability to care for and nurture their children. A psychologist involved with the family testified Mr. Egly had a problem with motivation rather than capability. The psychologist also stated Mr. Egly did not have a serious concern about the members of his family, and that he instead was economically motivated to get the children back.[1] He also testified the children would be at serious risk if they were returned to the Eglys' care.

Viewing the evidence and inferences therefrom in a light most favorable to the judgment, there was clear and convincing evidence that the children were removed from the home for at least six months under a dispositional decree, that the Eglys lack the most basic skills necessary to raise their children, and that they would not or could not develop these skills. There was evidence that the children flourished in foster care, and that the Welfare Department had satisfactory plans for the future care of the children.

1. Mr. Egly was receiving over $400 per month in social security disability, and Mrs. Egly, Walter, Jr., and Matthew each were receiving $59 per month.

It is unfortunate that the Eglys' mental retardation probably is the reason for their lack of parenting skills, and their inability to develop such skills. The fact still remains, however, that the children were intellectually, socially, and emotionally impaired because of the care, or lack thereof, they were receiving from the Eglys. This case is very similar to that of *Dull, supra.* The majority attempts to distinguish this case from *Dull* by stating the 8 year old boy in that case was emotionally disturbed because he masturbated excessively, chewed holes in linens, tore up furniture, and ate profusely. In this case, we have a 4 year old boy, not yet toilet-trained, who communicated by repeating everything that was said to him and who was socially, emotionally, and intellectually impaired. Perhaps by the time he is 8 years old he will be even more emotionally disturbed; I see no reason to wait that long.

These difficult judgments lie with the trial court, and our only role is to ensure the appropriate standard was met. We are not to substitute our judgment for that of the trial court. Although this may be perceived as a close case, there was clear and convincing evidence to support the trial court's determination. I would affirm the judgment of the trial court terminating the Eglys' parental rights.