ADOPTION OF ABIGAIL.[1]

Franklin. October 10, 1986. — November 24, 1986.

Present: KASS, KAPLAN, & FINE, JJ.

*Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Evidence,* Communication between patient and psychotherapist, Privileged communication. *Practice, Civil,* Deposition, Judicial discretion.

In a proceeding by the Department of Social Services seeking to dispense with the need for a mother's consent to the adoption of her child, there was clear and convincing evidence that the mother, who was mildly retarded and of limited understanding and judgment, was unfit to care for a child suffering from a complex of neurological and psychological disorders. [195-196]

On appeal from a determination that a mother was unfit to care for a child with particularly demanding needs, there was no merit to a contention made by counsel for the mother that the judge's finding of unfitness was based on the mother's history, rather than her present state and future, especially in light of the judge's findings, supported by the record, about the mother's current mental capacity, her emotional state, and the instability which was still present in the mother's life. [196]

On appeal from a determination that a mentally retarded mother was unfit to care for a child with particularly demanding needs, there was no merit to the mother's contention that the Department of Social Services failed to exert sufficient efforts to keep the mother and child together, where the record reflected the department's early objective to hold the family together and an abandonment of that objective which was reasonable in the circumstances. [197-198]

On appeal from a determination that a mother was unfit to care for her child, this court declined to consider the mother's contention, made for the first time on appeal, that the Department of Social Services had violated

[1] The Department of Social Services has suggested that it would be easier to identify and cite cases arising out of G. L. c. 210, § 3, proceedings if they included fictitious names for the children involved. The Justices of this court have adopted the suggestion and we shall, beginning with this case, employ fictitious names in rough alphabetical sequence. We shall use names denoting the correct gender.

her rights under art. 114 of the Amendments to the Massachusetts Constitution in failing to devise programs to compensate for the mother's limited intelligence and other defects. [198]

In a proceeding by the Department of Social Services seeking to dispense with the need for a mother's consent to the adoption of her child, the judge did not give undue emphasis to the bond which had been established between the child and her foster family, with whom she had been placed as a newborn and with whom she had lived since. [198]

On appeal from a determination that a mother was unfit to care for her child, this court declined to consider the issue of the patient-psychotherapist privilege under G. L. c. 233, § 20B, where the issue was raised for the first time on appeal, and where much of what was contained in the testimony in question would, in any event, have qualified as conclusions based on objective indicia rather than on communications from the mother. [198-199]

In proceedings to dispense with the need for a mother's consent to the adoption of her child, the judge did not abuse his discretion in denying the mother's request for leave to take a posttrial deposition of a prospective witness who had been unable to attend the trial. [199]

Where the record of a proceeding to dispense with the need for a mother's consent to the adoption of her child contained no evidence as to whether postadoption visits by the mother would be in the best interests of the child, there was no support for the mother's contention on appeal that termination of all parental relationship was too absolute and drastic a judgment. [199-200]


PETITION filed in the Franklin Division of the Probate and Family Court Department on August 16, 1984.

The case was heard by *Henry O'Connor, Jr.,* J.

*Wendy Sibbison* for the mother.

*Kim E. Murdock,* Assistant Attorney General, for Department of Social Services.

KASS, J. Sixteen days after her birth on October 27, 1982, Abigail was placed with the family by which the Department of Social Services proposes she be adopted. Nobody disputes the incapacity of Abigail's biological parents at the time of her initial placement. The question is the fitness of the biological mother[2] to be Abigail's parent in mid-April, 1985, when

---

[2] Neither Abigail's biological father nor the man whose surname she bears testified at the hearing on the petition to dispense with consent to adoption. Neither claimed an appeal from the judgment allowing the petition.

the petition was heard. Abigail was then two and one-half years old; and the mother was then thirty years old. A judge of the Probate Court found the mother was not fit, and she has appealed.

Abigail suffers from a complex of neurological and psychological disorders which manifest themselves in defective motor control and delayed development, notably in the areas of language and cognition. Toward the reduction of her deficits, Abigail has had the assistance of speech therapists, physical therapists, psychologists and social workers. As to language, for example, it was possible to work out particular phrases which the foster parents would use consistently. What another child might learn casually, Abigail could learn through frequent and consistent use. For whoever acted as her parents, this was a demanding task because it required careful listening to seemingly insignificant differences. Yet those differences would be decisive of the child's ability to understand. It was necessary to encode everyday speech into the more limited speech patterns within Abigail's grasp.

Similar special methods could compensate for Abigail's physical difficulties. The child was wont to topple over when standing or sitting, but it was possible to stimulate her balance responses in a way which would refine them so that the inherent handicaps could, in significant measure, be overcome. This, too, required a high order of attention and consistency by the persons responsible for Abigail's care.

Abigail's special needs are relevant because they bear on whether *this* particular mother (i.e., the biological mother) can be a fit parent to *this* particular child. We summarize what the judge found on clear and convincing evidence (see *Santosky* v. *Kramer,* 455 U.S. 745, 769-770 [1982]) about the mother.

The mother is mildly retarded; her Wechsler Adult Intelligence Scale quotient is 68. She has poor understanding of the meaning of simple vocabulary words. She shows little ability to understand how the world around her operates. Her judgment is limited, and she lacks a common-sense understanding of the

world.[3] During her own childhood, the mother moved among a series of institutions and foster homes. From age seven to fifteen she was a resident of the Belchertown State School, a facility for the mentally handicapped. From age fifteen to the time when Abigail was born, the mother's life was characterized by a series of moves, acute alcoholism, drug abuse, and intermittent encounters with the law. Often she was assaultive and suicidal. Her relationship with the biological father was on and off. At the time of Abigail's birth, the mother had moved in with another man.

In 1977, the mother made a connection with a family then resident in Burlington, Vermont, which we shall refer to as the Bee family. She lived with the Bees in 1977 and again in 1982, when she became pregnant. That relationship becomes important in the case because with the Bees the mother's life became less self-destructive and, indeed, comparatively stable.

It is easy to exaggerate that stability. Trial and appellate counsel for the mother (they are not the same) have understandably done so. In 1982, the Bees moved to New Hampshire when the mother was eight months pregnant and she moved to Greenfield. In December, 1983, the mother moved back with the Bee family. That lasted for the better part of a year, but in March, 1985, one month before the court hearing, the mother was not living with the Bee family; she was staying with the biological father and his teenage girl friend.

In attempting to make her case for assuming full legal responsibility for Abigail, the mother gave voice to an expectation that the members of the Bee family would backstop her in coping with Abigail's unusual problems. The probate judge was pessimistic about the prospects. The Bees, he found, had troubles of their own: Mr. Bee had undergone six major operations within a recent period; Mrs. Bee's father had just had his remaining leg amputated; and their ten year old son was handicapped and had special needs.

---

[3] In so finding the probate judge adopted verbatim language from a report made by Frank C. Sacco, a clinical psychologist who appeared at the hearing on the petition. It was not error to do so, see *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 431-432 (1980).

There were positive signs. The mother had held a job in a diner. She had brought her drinking and drug abuse under control and, when with the Bees, she was able to contribute to the care of the Bee children, preparing meals, getting them off to school and so forth.

If the question were simply one of the mother's limited intelligence, matched with a child of normal needs, there might not be a lawful basis for the radical step of terminating the link between natural mother and child. Mental retardation of a parent is not of itself a ground for terminating parental rights. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. 689, 696 & n.4 (1985). For a mental weakness to be relevant, "there must be a showing that it has a bearing on the parent's fitness or on the child's well-being." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 701 (1984).

We think the judge's findings make the necessary link between the mother's handicaps and her ability to raise Abigail. The child's medication, for example, requires that she receive, at the correct times, half-doses of phenobarbital twice daily and Dilantin thrice daily. There are the speech and physical reinforcement exercises. Those activities require concentration and orderliness which cannot reasonably be expected of someone with the mother's limited abilities. It may be, as the mother testified, "I got my act together" and that "[m]y past is my past." Assuming that progress has occurred, it nonetheless does not equip the mother for the peculiarly demanding parent tasks which Abigail requires. Nothing in the record suggests that the mother was able to acquire habits of precision. The following segment from the mother's direct examination illustrates the vague ideas she had about her child's specific needs.

"Q.: Do you have any special schools in Vermont?
A.: I'm checking it out.
Q.: Do you know that she needs special medical care?
A.: Yes. I'm checking that out, too."

Two clinical psychologists who had worked with the mother independently gave it as their opinion that the mother would

treat Abigail more as a doll to satisfy the mother's needs for a love object, rather than treating the child as a growing being.

The manner in which the parental fitness test and the best interests of the child test are to be applied as cognate and connected has been much discussed in the cases. Compendia of the authorities appear in *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. 793, 799-800 (1983), and *Petition of Boston Children's Serv. Assn. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. 566, 567 (1985). On the record before him, the probate judge was well warranted in concluding that the mother's deficits, matched with Abigail's deficits, would put the child's welfare greatly at hazard. See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 639 (1975); *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 13 Mass. App. Ct. 936, 937-938 (1982).

We think that counsel unfairly characterizes the judge's finding of unfitness as based on the mother's history, rather than the present state and future. A past pattern of behavior is, in any event, not irrelevant; it has prognostic value. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 395 Mass. 180, 185 (1985); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. at 695. In addition, the judge made findings about the mother's current mental capacity, her emotional state, and the components of instability which were still present in the mother's life. For those findings there was record support in the testimony of six social workers, two clinical psychologists, two therapists and Abigail's guardian ad litem, who was asked to report on the child's best interests. The testimony of Jean Thompson, a service coordinator for the "Franklin County Service," and Michele Reiter, the manager of the Berkshire Unit of Northampton State Hospital, did not compel a contrary conclusion, even were we to assume that the judge had accepted it without reservation, which he was not, of course, bound to do.

We think similarly unconvincing the mother's argument that the department failed to exert sufficient efforts to hold the biological mother and her child together. Granted, to attempt, *reasonably,* to maintain the biological ties was the department's duty. See G. L. c. 119, § 1; 110 Code Mass. Regs. § 1.06(1) (1982); *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 392 Mass. 738, 743 (1984); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. 120, 127 n.12 (1984). Our view of the record is that it reflects an early objective to hold the family together and an abandonment of that objective, which was reasonable in the circumstances.

The original removal of Abigail at age sixteen days from her mother's custody was provoked by crisis. The mother at that time could not cope with child care at all. Indeed, she did such impulsive and dangerous things as removing a monitor from the infant while the child was in the hospital and attempting to take the baby out of the hospital. There was evidence that the mother denied the existence of Abigail's handicaps and said that all children have cerebral palsy. She rejected counseling from the department, often declined to tell the department her whereabouts and, on one occasion, in a fit of ire, vandalized her social worker's car. Nevertheless, the department maintained contact with the mother and arranged for visitation with her child. Nothing occurred prior to the end of 1983 which could be said to have encouraged the department to think that the mother, assuming support from professionals, could handle the demanding tasks and techniques we have described.

In view of the circumstances the department came upon at Abigail's birth and when, in May, 1983, she was placed under the care and protection (see G. L. c. 119, §§ 24-26) of the department, it would have required a high and unreasonable measure of optimism to press ahead with a specific plan for keeping the mother and Abigail together. The mother's counsel urges that the department persisted in prejudging the mother as unfit. As we read the record, the agency judgments were after-the-fact; i.e., the conclusions of unfitness were based

on history available at the time and on the recommendations of the professionals (social workers and psychologists) employed by, or reporting to, the department.

We touch briefly on other points raised by the appellant.

(a) *Constitutional rights of the handicapped.* The mother argues for the first time on appeal that her low intelligence establishes her as a handicapped person who may bring to bear article 114 of the Amendments to the Massachusetts Constitution, approved in 1980, which provides:

> "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth."

As applied to her case, the mother's argument runs, the department must devise programs which compensate for the mother's deficits. We need not, and in this case do not, consider constitutional questions not raised and developed in the record below. See and compare *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. at 697.

(b) *Bonding.* The Probate Court judge did not improperly weigh the bond which had obviously been established between Abigail and the foster home in which she had been placed as a newborn and in which she has lived since. See and compare *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119 (1984). It is apparent to us that the focus of the judge's finding is that the mother did "not have the ability or capacity to assume parental responsibility."

(c) *Testimony of the two psychologists.* Dr. Sacco and Dr. Karson, both clinical psychologists, examined and tested the mother. Their written reports, as well as their testimony, were received in evidence without objection by the mother's counsel. The patient-psychotherapist privilege conferred by G. L. c. 233, § 20B, is one which a patient may exercise. No effort was made to do so, and the privilege issue cannot now be raised as a second thought of appellate counsel. Much of what is contained in the Sacco and Karson testimony would, in any

event, qualify as conclusions based on objective indicia rather than on communications from the mother. See *Commonwealth v. Korbrin,* 395 Mass. 284, 294-295 (1985). As to the application of the privilege to cases involving the drastic step of termination of the parental relationship, see *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 392 Mass. 738 (1984); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 396 Mass. 485, 487 (1986). Compare *Department of Youth Servs. v. A Juvenile,* 398 Mass. 516 (1986).

(d) *Requested deposition of absent witness.* At trial the mother had hoped to introduce testimony from Mrs. Bee, which, she anticipated, would have reflected favorably on her ability to be responsible for Abigail. Mrs. Bee, who resides in Vermont, was unable to attend at trial because of family responsibilities. Counsel for the mother moved for leave to take a posttrial deposition in Burlington, a motion which the judge denied. There was no abuse of discretion. By its nature, this was a case in which the opportunity to see and form an impression of key witnesses played a central role. To the extent that Mrs. Bee's testimony was offered to prove that she could act as a support for the mother, the judge could reasonably have decided he would accord such testimony little weight unless he could also see and hear the witness. That consideration would bear on whether the judge would decide to hold the record open, an aspect of case management about which he had broad discretion. See *Bucchiere v. New England Tel. & Tel. Co.,* 396 Mass. 639, 641 (1986); *Greenleaf v. Massachusetts Bay Transp. Authy.,* 22 Mass. App. Ct. 426, 429 (1986).

(e) *Postadoption visitation.* Finally, the mother urges that termination of all parental relationship is too absolute and too drastic a judgment; some postadoption visitation by the mother ought to have been provided for. Postadoptive visiting may, indeed, in limited circumstances, be included in a plan for adoption. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. at 702. Whether to do so is more a question of what is in the interests of the child,

rather than one of the rights of the parent. Cf. *Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. 252, 265-267 (1978); *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 376, 379 (1981). It does not appear from the record that postadoptive visitation was ever broached as a possibility which the Probate Court judge ought to consider. The nearest the evidence came to the point was testimony to the general effect that the only way the mother could occupy a parent role would be if she were merely on the scene, while others did the actual child rearing. There was no evidence whatever bearing on whether the visits by the mother would be good or bad for the child. The judge would have been in no position to decide whether postadoptive visitation was well or ill advised.[4] In the circumstances, we can scarcely say it was error that the judge failed to make a postadoptive visitation order. There is, generally, an element of finality in proceedings under G. L. c. 210, § 3, which we are not quick to undo. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 392 Mass. at 740-742. See also *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 384 Mass. 707, 714-715 (1981), which speaks to the importance, generally, of not revealing the identity of adoptive parents to the biological parents.

*Decree affirmed.*

---

[4] Some of the considerations are discussed in Note, Visitation after Adoption: In the Best Interests of the Child, 59 N.Y.U.L. Rev. 633 (1984).