531 So.2d 345 (1988)
In the Interest of C.N.G., a Child.
Tina Marie Gunter, Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 87-235.
District Court of Appeal of Florida, Fifth District.
July 28, 1988.
Rehearing Denied September 23, 1988.
Marilyn Mayden, Ocala, for appellant.
Robert A. Butterworth, Atty. Gen., and Louis F. Hubener, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
AFFIRMED.
UPCHURCH, F.D., Jr., Judge, Retired, and GREEN, O.L., Jr., Associate Judge, concur.
COWART, J., dissents with opinion.
COWART, Judge, dissenting.
Because of her permanent intellectual disability, appellant, hereinafter mother, was placed in foster care in the custody of H.R.S. in her early childhood. While there is some difference of opinion about the extent of her disability,[1] it is fair to say that the mother always has functioned, and always will function, intellectually at a low level. While she was sixteen years of age and still in foster care, she became pregnant and gave birth to C.N.G. on August 26, 1984. Because of the mother's own legal dependency, H.R.S. took custody of the child at birth and placed it in foster care where it remained until these proceedings. Notwithstanding the mother's disabilities,[2] H.R.S. entered into a performance agreement with her on February 15, 1985, which required her to obtain gainful employment by the time she graduated from high school in June 1985, to acquire adequate housing, and to learn to care for her child. Of course, because of her permanent mental disabilities, the mother was *346 not able[3] to comply with the performance agreement. On or about August 21, 1985, when the mother reached eighteen years of age, she was transferred to an adult foster care home.[4] The next day proceedings were instituted by H.R.S. to permanently terminate the mother's parental rights in and to her child.[5] After final hearing in the permanent commitment proceeding, the trial judge found it was in the best interest of the child to be permanently committed for subsequent adoption, and permanently terminated the mother's parental rights, expressly finding that the mother had never abandoned, neglected, or abused her child. The mother appeals.
The mother argues that her parental rights cannot be permanently terminated solely because it is in the best interest of the child and that under section 39.41(1)(f), Florida Statutes, and numerous cases[6] interpreting that statute, her constitutional right to maintain her parental relationship with her child cannot be permanently terminated in the absence of clear and convincing evidence that she abandoned or abused her child, or that she neglected to care for her child while being able to do so.
H.R.S. responds in this appeal that in order to terminate parental rights it is not necessary to prove that the parent, while able to care for the child, has intentionally neglected, abandoned, or abused the child. H.R.S. relies on district court of appeal decisions[7] which hold that when it appears a parent will be unable to provide necessary child support in the future, the trial court can find "prospective neglect" and, concluding it to be in the best interest of the child, terminate the parental rights and place the child for adoption.[8]
The cases cited by H.R.S. assert the novel and innovative concept of "prospective abuse or neglect." This court, in Spankie, held that under extraordinary circumstances, including the mother's concession that she had neglected to protect her child from the malnourishment, whippings, bone fractures, and other abuse caused or done by another person, prospective abuse and neglect could be factored into the trial court's decision to terminate parental rights. Unlike Spankie, however, the mother in this case has never had actual custody of, and has never abused, neglected, or abandoned her child. Both the trial court and H.R.S. expressly concede this.[9]
The mother's only fault is to have been born with a below average mental and emotional capacity. While this issue in this case is novel and appears never to have been directly addressed by the courts in Florida, it appears that the few jurisdictions which have considered the question hold that a parent's mental retardation, by itself, is not a ground for termination of parental rights. See Matter of Dull, 521 N.E.2d 972 *347 (Ind. Ct. App. 1988); Adoption of Abigail, 23 Mass. App. Ct. 191, 499 N.E.2d 1234 (1986); Matter of Atkins, 112 Mich. App. 528, 316 N.W.2d 477 (1982); Helvey v. Rednour, 86 Ill. App.3d 154, 41 Ill.Dec. 671, 408 N.E.2d 17 (1980); Matter of J.L.B., 182 Mont. 100, 594 P.2d 1127 (1979).
Can it be said that the parental rights of a father, who is unable to perform his parental duties because he is in prison, cannot be permanently terminated, as was held in In the Interest of B.W., 498 So.2d 946 (Fla. 1986), but that the parental rights of the mother in this case, who is unable to fully perform her parental duties because she was mentally shortchanged by nature, can be permanently terminated? A mother's parental rights in and to her child, and the child's corresponding rights in and to its mother, cannot be terminated by the State based solely upon the mother's deficient parental capabilities which result from conditions beyond her control.
Accordingly, notwithstanding the natural parent's inadequacy and a judicial belief that it may be in the best interest of the child to be adopted by more adequate parents, under Florida law, proof by clear and convincing evidence that a parent who is able to do otherwise has abused, neglected, or abandoned a child is essential to an involuntary termination of that parent's rights in and to that child. This court should certify the following question to be one of great public importance:[10]
Can the parental rights of a mother who has not abandoned, neglected, or abused her child be permanently terminated only because, through no fault of her own, she is mentally and emotionally unable to provide necessary support and care for her child and it is in the best interests of the child that it have a more adequate mother? OR: Is mental retardation of a parent a ground for termination of parental rights?
The legislative branch of government should address the very serious social problems underlying this case. However, there is also a legal issue involved which, while novel, difficult, and subject to difference of opinion, is nevertheless extremely important. This is not a case which should be decided by a PCA. While that may dispose of the court's problem in this particular case, the issue will not go away and, in the interest of the public, it should be openly and courageously addressed.
The order permanently terminating the mother's parental rights should be reversed.
NOTES
[1] The clinical psychologist for H.R.S. testified at trial that the mother's intellectual skills are at the fifth percentile for adults her age, but that she could not be classified as mentally retarded. The mother's full scale I.Q. was measured to be 75. The mother's retained psychologist testified that her I.Q. falls between "mildly retarded" and "low average intelligence." Prior to trial, two psychologists measured the mother to be in the 75-77 range of intellectual functioning. Another psychological report submitted to the trial court measured the mother to be in the 43-54 range of intellectual functioning, and calculated her mental age at eight years, eight months. The mother challenges the factual determination that she is mentally and emotionally unable to provide adequate parental care for the child in the future but that assessment and determination are accepted as correct.
[2] Based on the mother's intellectual disability to maintain employment and to care for herself, H.R.S. obtained social security benefits for the mother.
[3] See, e.g., In the Interest of B.W., 498 So.2d 946 (Fla. 1986).
[4] On December 5, 1985, while the mother was still in foster care, she gave birth to a second child, which is in the custody of the paternal grandparents and is not involved in this proceeding.
[5] In about May, 1986, the mother moved out of the adult foster care home and into an apartment with a retarded alcoholic male roommate (not the father of either of her children) whom she had met in a child foster care home.
[6] See, e.g., In the Interest of R.W., 495 So.2d 133 (Fla. 1986); Darkes v. Department of H.R.S., 495 So.2d 873 (Fla. 5th DCA 1986); In the Interest of L.T., 464 So.2d 201 (Fla. 5th DCA 1985).
[7] Spankie v. Department of H.R.S., 505 So.2d 1357 (Fla. 5th DCA), rev. denied, 513 So.2d 1063 (Fla. 1987); Warren v. State, Department of H.R.S., 501 So.2d 706 (Fla. 2d DCA), rev. denied, 508 So.2d 16 (Fla. 1987); In the Interest of A.B., 444 So.2d 981 (Fla. 1st DCA 1983); and In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982).
[8] The mother in this case, while herself a child in child foster care in the custody of H.R.S., twice became pregnant. That was certainly not in the best interest of the child mother or her two child offspring! H.R.S. would have parental rights permanently terminated on evidence of "lack of parenting skill" and of "child neglect" far less convincing than the evidence in this case of "lack of parenting skill" and of "child neglect" on the part of H.R.S.
[9] Despite the mother's problems, the psychologist for H.R.S. admitted that he had no fear that the mother would ever be intentionally neglectful of, or abusive to, her child.
[10] The final legal answer to this question should be carefully considered because any principle justifying an affirmative answer will necessarily justify the permanent termination of parental rights by the government in every situation where government agencies consider it to be in the best interests of the children. That is a very dangerous doctrine, and any case establishing it will be a most dangerous precedent. While the best interests and welfare of the child is the sole guide in legal controversies relating to a child's custody, it has no proper place when the issue is the permanent termination of parental rights. The reason should be obvious. It is in the best interest and welfare of every child to have the best possible parents. Whatever criteria are used to measure the desirable characteristics of ideal parents, obviously one-half of all parents are superior to, and better than, the other half. Any rule of law permitting the government to permanently terminate natural parental rights based on the best interests of the child will justify the government in taking all children away from the less adequate half of all parents and giving them to the other, "better," half. Under such a rule of law the government need merely say: "Look, kid, we will find you some better parents." The writer agrees with Judge Sullivan, who, dissenting in Matter of Dull, supra, wrote:

The decision today constitutes an unwarranted and very real threat to every parent who feeds, clothes, shelters and loves his child, but happens to be intellectually and economically less well endowed than is acceptable to those of us who work within governmental social agencies and judicial systems.
Would that I had the skill and the erudition to dissent in stronger terms.