NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-447

CARE AND PROTECTION OF ZERLINDA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a judge of the Juvenile Court found the mother, the father, and the maternal grandmother (grandmother) unfit to parent Zerlinda,[2] adjudicated the child to be in need of care and protection, and committed her to the permanent custody of the Department of Children and Families (DCF).  See G. L. c. 119, §§ 24-26.  The grandmother appeals, contending that DCF failed to demonstrate by clear and convincing evidence that she was unfit to assume parental responsibility for the child and that the unfitness was likely to continue into the indefinite future.  The grandmother also claims the judge committed

_____

[1] A pseudonym.

[2] At trial, the father and mother conceded their parental unfitness and requested the return of custody of the child to the grandmother.  The parents are not parties to this appeal.

prejudicial error by predicating findings of fact on inadmissible hearsay.  We affirm.

Background.  We summarize the judge's findings of fact, reserving certain details for later discussion.[3]  Zerlinda was born in February 2012.  In late 2012, she began to reside with the grandmother full time after the grandmother suspected the mother of using drugs.  The grandmother eventually filed a petition for guardianship, and following a hearing in the Probate and Family Court, she was appointed guardian of Zerlinda in January 2015.  The grandmother permitted the mother to visit with Zerlinda so long as the mother was sober, and the grandmother was present.  There were occasions where the grandmother asked the mother to leave the grandmother's home at the start of a visit or as the visit went on due to concerns about the mother sobriety.  In one such instance, in November 2014, a report alleging abuse and neglect was filed under G. L. c. 119, § 51A (51A report), alleging the mother and grandmother had a physical altercation in which the mother cut the grandmother on the lip with a knife.  Zerlinda was in the home

---

[3] The trial judge made 157 findings and twenty-two conclusions of law in support of her decision that the parents and the grandmother were unfit, and the findings "demonstrate that close attention has been given the evidence."  Custody of Eleanor, 414 Mass. 795, 799 (1993).

and asleep during the altercation.[4]  Another time, in February

2021, the mother was at the grandmother's home when the mother

was civilly committed under G. L. c. 123, § 35.[5]

Despite the grandmother's efforts, Zerlinda was exposed to

the mother's substance use in several instances while in the

grandmother's care.  The most alarming instance of exposure

occurred between October and November 2022, when the grandmother

permitted the mother and the mother's boyfriend to reside at the

grandmother's home while Zerlinda was present.  During this

time, on November 8, 2022, the grandmother left the child in the

home with the mother while the grandmother drove the mother's

boyfriend to a court appearance for a drug-related case.  In the

grandmother's absence, Middleborough police officers attempted

to serve arrest warrants[6] on the mother at the grandmother's

home.  Upon arrival, the police discovered a man in a vehicle

parked at the residence.  After speaking with this man, the

police recovered fentanyl from his pocket.  After knocking on

---

[4] The allegations were unsupported by DCF.

[5] General laws c. 123, § 35, allows a qualified person to request a court order requiring an individual to be civilly committed and treated involuntarily for "an alcohol or substance use disorder."

[6] At the time, the mother had three default warrants for drug offenses, including two counts of possession of a class E substance, possession of a class A substance, and possession of a class B substance and shoplifting.

the door and receiving no answer, the police entered the residence and found Zerlinda, who told them she was home alone. The police then found a purse with drug paraphernalia, including suspected fentanyl residue, syringes, and a spoon, in close proximity to the child. The police discovered the mother hiding under a bed. The arresting detective described mother as "a suffering drug addict on the verge of death": she was covered in sores, underweight, and "had teeth falling out." The detective also concluded that the mother had been using drugs in the home. While being placed under arrest, the mother yelled at Zerlinda for "ratt[ing] her out" and screamed that she "fucking hate[d] [Zerlinda]." When the grandmother returned home, although she appeared sober to the police, she admitted to having actively been using cocaine that she bought from the mother's supplier.

Following the November 8 incident, the Middleborough police filed a 51A report alleging neglect of Zerlinda by the mother and grandmother due to substance use concerns. Additionally, the report alleged that the mother's boyfriend, who had also been living with the grandmother, was in possession of a firearm and was wanted by police for armed robbery and drug possession. When DCF workers investigated the report, the grandmother was not forthright with them. She reported that she was running errands on November 8, and only admitted she was bringing the

4

mother's boyfriend to court when probed further.  The

grandmother minimized her substance misuse history and denied

being on medications before admitting to being prescribed

Suboxone.  Additionally, the grandmother denied having a

criminal history, claiming her last arrest had occurred more

than ten years ago despite being arrested for possession of a

class B controlled substance in November 2021.  DCF supported[7]

the 51A report stemming from the mother's arrest on November 8

and conducted an emergency removal of Zerlinda, who was placed

in kinship foster home.  Following Zerlinda's removal, DCF

developed action plans for the grandmother, mother, and father.

DCF largely focused on reunification with the grandmother, to

whom Zerlinda wanted to return.

The grandmother did not comply with several of DCF's action

plan tasks.  Contrary to DCF's action plan, the grandmother did

not attend all court dates, meetings, and reviews.  The

grandmother did not refrain from illegal activities, as the

judge found that she participated in a drug transaction in May

2023.  The grandmother also refused to provide treatment

---

[7] As relevant to this appeal, DCF's regulations provided
that a 51A report will be "supported" if DCF "has reasonable
cause to believe that an incident (reported or discovered during
the investigation) of abuse or neglect by a caretaker did
occur."  110 Code Mass. Regs. § 4.32(2) (2009).

5

information to DCF relating to concerns around her ongoing substance use.

Further, the grandmother provided conflicting statements regarding her ability to set boundaries with the mother. The grandmother told a DCF social worker she had taken out a "no trespass order" against both the mother and mother's boyfriend, but at trial, she admitted she did not take out an order against the mother. The judge found that at the time of trial, the grandmother continued to lack insight into the risk the mother posed when acting as sole caretaker to Zerlinda.

After removal on November 8, 2022, Zerlinda was placed with a kinship resource until late January 2023, spent one night in an unrestricted foster home, and then was placed in a different foster home, where she remained as of trial. Under the grandmother's care, Zerlinda was frequently absent from or late to school, received minimal homework assistance from the grandmother, and was not enrolled in any after-school activities. In her foster home, Zerlinda received assistance with her schoolwork and was actively engaged in her school community. The grandmother also did not ensure Zerlinda was up to date with dental care. Within the first month of being placed in her foster home, Zerlinda was brought to the dentist to receive treatment for a broken tooth and cavities. In September 2023, DCF changed the goal for Zerlinda from

6

permanency through reunification to permanency through guardianship, without termination of parental rights; her foster parent was her proposed guardian.

Discussion. In the context of a care and protection proceeding involving termination of parental rights, before turning to the question of termination, in order to remove a child from a parent and commit her to the permanent custody of DCF, the judge must find by clear and convincing evidence that the parent is unfit and that the unfitness will continue indefinitely into the future. See Adoption of Lisette, 93 Mass. App. Ct. 284, 296 (2018). See also Adoption of Peggy, 436 Mass. 690, 701 (2002) ("Before a judge may award permanent custody of the child to the department, the judge must find, by clear and convincing evidence, that the natural parent is unfit to further the welfare and best interests of the child"). This is a care and protection proceeding in which DCF was granted permanent custody of the child, who was under guardianship of the grandmother by order of the probate court with mother's consent and because father was incarcerated. Although the appellant is the guardian grandmother and not a parent, we will assume without deciding that is the proper standard here.[8] "Subsidiary

_____

[8] For the first time on appeal, DCF argues an "unsuitability" standard applies, which is lower than clear and convincing evidence of unfitness, because the grandmother does not possess the same fundamental liberty interest as a parent

7

findings must be proved by a fair preponderance of the evidence," Adoption of Helen, 429 Mass. 856, 859 (1999), but in conducting our review, we defer to "the judge's assessment of the weight of the evidence and credibility of the witnesses." Custody of Eleanor, 414 Mass. 795, 799 (1993).

1. Grandmother's unfitness. The grandmother argues the judge erred in determining her to be unfit because there was no evidence that her parental deficiencies impacted her ability to parent Zerlinda. We disagree. The grandmother's unfitness resulted from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000).

First, there was ample evidence that the grandmother was unable or unwilling to set appropriate boundaries with the mother, in whose care Zerlinda was at risk. On November 8, 2022, the grandmother left the child in the sole care of the mother. When police officers arrived at the grandmother's residence, they discovered a man, who possessed suspected fentanyl, waiting outside in a car, while the mother hid inside the residence. As detailed above, the officers suspected the

---

does with their children. "Objections, issues, or claims -- however meritorious -- that have not been raised at the trial level are deemed generally to have been waived on appeal." Palmer v. Murphy, 42 Mass. App. Ct. 334, 338 (1997). Because this claim "fits none of the usual exceptions to the general rule that claims not raised below are waived," we need not address it. Id. at 338-339.

mother of using drugs in the home, and they recovered drug paraphernalia and fentanyl residue in close proximity to Zerlinda.  When DCF workers arrived at the residence on the same day, Zerlinda reported that the mother had been residing at the grandmother's home for one month. During this time, Child stated that the mother would drink "anything"; "took medicine, usually pills," after which the mother would "become very sleepy, often falling asleep when sitting or standing up"; and, at times, "acted strange" and "just stare[d] out the window."  By allowing Zerlinda to be in the supervision of an active drug user and in close proximity to drugs, the judge's conclusion that the grandmother exposed the child to considerable risk was amply supported by the evidence.

Further, the judge properly concluded that this risk was likely to continue because the grandmother lacked insight into the danger posed by the mother being left alone with Zerlinda. For example, at trial, the grandmother expressed regret about leaving the child in the mother's care on the day of the child's removal, but only for the reason that the grandmother was unaware the police would be executing a warrant on the mother that day.  The grandmother's failure to appreciate this risk was also demonstrated when she provided DCF with inconsistent statements about her ability to set boundaries with the mother, including her misleading DCF as to obtaining a "no trespass

9

order" against the mother. Thus, it was proper for the judge to consider the grandmother's inability to set boundaries with the mother as evidence that the child would be at risk if placed in the grandmother's care. See Adoption of Jacob, 99 Mass. App. Ct. at 272-273 & n.18. See also Adoption of Elena, 446 Mass. 24, 27, 32 (2006) (mother unfit to parent children in part because she "left them in the care of [drug users]").

Second, the grandmother had her own ongoing challenges with substance misuse. In November 2022, at the time of the child's removal, the grandmother admitted to actively using cocaine to self-medicate. A history of substance misuse is "relevant to a parent's willingness, competence, and ability to provide care," Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008), provided there is a sufficient nexus between the substance misuse and unfitness. See Care & Protection of Bruce, 44 Mass. App. Ct. 758, 763 (1998). See also Adoption of Katharine, 42 Mass. App. Ct. 25, 34 (1997) ("a cocaine habit, without more, [does not] translate[] automatically into legal unfitness to act as a parent").

Such a nexus is present here. For instance, the grandmother was not forthcoming with information about her substance misuse and prescribed medications. She initially denied, before eventually admitting, that she was prescribed Suboxone, and she refused to provide treatment information to

10

DCF relating to her ongoing substance misuse. In addition, the judge reasonably found, based on a police officer's testimony, that in May 2023 the grandmother participated in a drug transaction involving crack cocaine. Thus, given the grandmother's lack of candor and proximity to criminal activity relating to her substance misuse, the judge properly considered the grandmother's substance misuse as a factor in the unfitness inquiry. See Adoption of Luc, 484 Mass. at 147 ("the mother's unwillingness to adhere to DCF's service plan, which required her to obtain treatment for her . . . substance use disorder, is 'relevant to the determination of unfitness'" [citation omitted]); Adoption of Helen, 429 Mass. at 860 ("unsuccessful attempts to address" substance misuse issues properly considered in termination proceedings); Adoption of Mario, 43 Mass. App. Ct. 767, 772 (1997) (nexus between drug use and parental unfitness established in part due to mother violating probation and subjecting herself to incarceration while child was in her care).

Third, the grandmother failed to provide the child sufficient dental care or academic support. Subsequent to her removal, Zerlinda required four appointments to address her dental needs. Within the first month of being placed in her foster home, she was brought to the dentist and thereafter had all of her dental work completed. In considering the

11

grandmother's inadequate pursuit of the child's dental care as a factor bearing on unfitness and contrasting the child's condition in the grandmother's care with her condition after removal, the judge acted within her discretion. See Adoption of Anton, 72 Mass. App. Ct. at 676 ("Where a parent is ineffective in obtaining medical care for a child, causing neglect of the child, it is relevant to finding of unfitness" [citation omitted]). See also Adoption of Kimberly, 414 Mass. 526, 530-531 (1993). Further, the judge found the grandmother did not assist the child, who had an individualized education plan, with homework; did not ensure the child's consistent attendance at school; and noted the child was not enrolled in any after-school activities. The judge also found that while under the care of her foster parent, the child received assistance with her homework and was engaged in cheerleading. The fitness of a parent or grandparent must be viewed with the specific needs of the child in mind. See Adoption of Abigail, 23 Mass. App. Ct. 191, 193 (1986). Thus, consideration in the grandmother's unfitness determination of the child's academic needs, which were substantial given the child's need for increased academic attention, and comparing how these needs were met after removal, was also within the judge's discretion. See Adoption of Kimberly, 414 Mass. at 530-531; Adoption of Oliver, 28 Mass.

App. Ct. 620, 625 (1990) (mother properly found unfit where she had little understanding of child's substantial needs).

Lastly, the grandmother refused to verify her compliance with mental health treatment, as set out in her DCF action plan. The grandmother argues the judge erred under G. L. c. 112, § 135B (social worker-client privilege), and G. L. c. 233, § 20B (psychotherapist-patient privilege), by faulting the grandmother for refusing to waive the privilege attached to her therapy records. The statutes, which contain the same relevant language, provide that "[u]pon the exercise of the privilege . . . the judge or presiding officer shall instruct the jury that no adverse inference may be drawn therefrom." Here, the grandmother did not assert either privilege below; she cannot do so now. See Adoption of Abigail, 23 Mass. App. Ct. at 198 ("No effort was made to [assert the patient-psychotherapist privilege in the trial court], and the privilege issue cannot now be raised as a second thought of appellate counsel").

2. Hearsay. The grandmother argues that the judge erred by admitting in evidence and relying on the May 2023 Middleborough police report (police report) in her decision.[9] Specifically, the grandmother contends the police report

---

[9] The police report detailed the grandmother's alleged role in a drug transaction that occurred in a public parking lot as observed by police.

13

contained inadmissible hearsay and statements of opinion, which the judge relied on in making findings of fact, and that reliance prejudiced her. This argument is unavailing.

"We need not decide whether the judge erred in admitting [the police report] because, even assuming error, there was no resulting prejudice." Adoption of Luc, 484 Mass. at 148. The police report was cumulative of the police officer's trial testimony. See id. Further, there was other evidence of the grandmother's substance misuse, and a nexus to her parental unfitness, as well as other parenting deficiencies that supported the judge's conclusion. See Adoption of Kimberly, 414 Mass. at 538 (no prejudice where findings based on alleged inadmissible evidence "not so inconsistent with the judge's other findings as to raise any question concerning his ultimate conclusion").

Judgment affirmed.

By the Court (Rubin, D'Angelo & Smyth, JJ.[10]),

_Paul Little_
Clerk

Entered: April 10, 2025.

---

[10] The panelists are listed in order of seniority.

14