NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1464

ADOPTION OF PACO.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, and entry of the mother's stipulation terminating her parental rights, a Juvenile Court judge found the father unfit to parent the child, awarded custody of the child to the Department of Children and Families (department), determined that the department's adoption plan was in the child's best interests, and entered a decree terminating the father's parental rights.  The father appeals, and we affirm.

Background.  The child, born prematurely in December 2017 at twenty-six weeks, spent the first three months of his life in the hospital's neonatal intensive care unit.  Due to his premature birth, the child (age five at conclusion of trial) has several significant needs around feeding and nutrition, sleep, asthma, and allergies.  He also has behavioral and emotional

_____

[1] A pseudonym.

difficulties.  These needs require frequent appointments with specialists, prescribed medication, and follow-up care.  He began preschool, completed an early intervention service, and started an assessment for an individualized education plan due to a concern about his ability "to follow regular instructions." The child has been in the same foster home since January 2020.

The father reported being diagnosed with mental health conditions (including posttraumatic stress disorder, depression, anxiety, schizophrenia, and multiple personality disorder).  He testified that he has had an imaginary friend since the age of fourteen.  He receives some treatment for the persistent symptoms of these mental health conditions but struggles to recall taking medications and rarely accounted for prescription medications during home visits by an ongoing social worker.  In addition to having difficulty managing his prescriptions, the father self-medicates with marijuana and oxycodone.  The father also experienced periods of housing instability, has been involved in multiple instances of domestic violence, has been the subject of three restraining orders, has violated the terms of his probation, and has been incarcerated.

The department first became involved with the child in the days following his birth based on a report filed pursuant to G. L. c. 119, § 51A.  The department opened a case for services

2

after an investigation of the report resulted in a decision to support allegations that the mother used marijuana during her pregnancy, both parents experienced significant symptoms of untreated mental health conditions, and both parents engaged in domestic violence resulting in the loss of housing. The father reported to the department that he did not remember the domestic violence incident because he experienced two seizures and "was out of it." The mother obtained a restraining order against him that remained in effect for more than two years, until February 14, 2019.

On December 10, 2019, the father was arrested and charged with two counts of assault and battery by means of a dangerous weapon, assault and battery on a family or household member, threatening to commit a crime, and larceny, with the mother listed as the victim. Following his arrest, another restraining order issued, requiring the father to stay away and have no contact with the mother and the child. While in custody awaiting trial, the father reported to a department investigator that he "never touched" the mother. He later pleaded guilty and was placed on probation.

On January 21, 2020, the mother left the child in the care of his maternal aunt, who subsequently took him to the hospital with an eye infection. The father, who was at the same hospital

3

for medical care, took the child and left the hospital.  Soon after, the police located the father and arrested him for violating the restraining order.  The following day, the department obtained emergency custody of the child.  The child has remained in department custody since that time.

The next month, the department established a family action plan for the father.  The action plan included requirements that the father maintain contact with the department, participate in a parenting course, complete an intimate partner violence education program, and identify and consistently meet with a therapist and psychiatrist.  Complying with part of the action plan, the father completed an intimate partner violence education program and parenting course.  Not complying with other parts of the plan, the father failed to consistently meet with a therapist, provide the department with his psychological evaluation, and provide adequate proof of his income.  Additionally, the father missed over twenty visits with the child, resulting in over a month between some visits.

On February 12, 2024, following a trial held over five nonconsecutive days and during which the father testified, a judge adjudicated the child in need of care and protection, found the father unfit, and found that termination of the father's parental rights was in the child's best interests.  The

4

judge approved the department's plan for adoption of the child by his current foster parents and allowed for limited posttermination and postadoption visitation with the child by the father.

Discussion. To terminate parental rights to a child and to dispense with parental consent to adoption, "a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "In determining whether the best interests of the child[] will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents.'" Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Based on these standards, we discern no error or abuse of discretion.

We disagree with the father's contention that the judge "relie[d] on the father's stale history of assaultive behavior[.]" While "stale information cannot be the basis for a finding of current parental unfitness . . .[p]rior history . . . has prognostic value." Adoption of Jacques, 82 Mass. App. Ct. at 607, quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989). The judge considered the father's history of violence against the mother and others, while also acknowledging the improvements made by the father. Specifically, the judge noted that since completing an intimate partner abuse prevention course in 2020, "[t]here is no evidence that [the father] was involved in any domestic violence incident[.]" Even so, the father admitted at trial that he had a pending assault and battery charge following an altercation with a tow truck driver. The evidence also showed that the father reacted aggressively to department staff on at least one occasion while visiting the child. In light of such repeated incidents, the father's violent and aggressive behavior served as prognostic evidence that was "within the purview of the judge to consider." Adoption of Jacques, supra at 607-608.

Next, the father argues that the judge erred in finding that he did not understand, nor was he able to meet, the child's needs. The father points to several of the judge's findings in

6

advancing this argument, including that he did not understand the child's medical, emotional, and behavioral conditions requiring specialized care; that he did not attend medical appointments; and that he "willfully" missed visits with the child. We discern no error. The father testified generally about the child's medical needs, and that the child took medication. Despite this general understanding, the father did not know what medications the child needed, nor did he ever ask about the medications. As the father acknowledges in his brief, his lack of knowledge likely comes from his absence from the child's medical appointments -- a circumstance he blames on "hurdles" beyond his control such as lack of transportation. The record, however, shows that the father repeatedly turned down offers by the department to assist with attending medical appointments. Additionally, there was ample evidence of the father's failure to consistently attend scheduled visits with the child. While some visits were canceled by the department, several visits were missed because the father failed to confirm or even show up. Where the father did not consistently attend medical appointments or visits with the child, or express any understanding of the child's care regimens, the record supports the judge's findings that the father did not understand and could not meet the child's complex needs. See Adoption of Mary,

7

414 Mass. 705, 711 (1993) (parental unfitness must be determined on consideration of child's particular needs).

We disagree with the father's contention that there is insufficient evidence that he "misuse[d]" prescription medication at the time of trial, and that there was no nexus between the substance use and his ability to parent the child. While this case was pending, the father tested positive for a component of marijuana, tetrahydrocannabinol (THC), and the department expressed concerns about his substance use. Evidence showed that the father needed help maintaining his regimen of prescribed medications and rarely accounted for these medications during department visits. The father admitted at trial that he lied to the department about his substance use, leading the judge to conclude that the "[f]ather does not recognize that he misuses unprescribed substances and thus has not engaged in any services to address it[.]" Based on the father's inability to manage his own prescription medications to address persistent negative symptoms of his mental health conditions, the positive drug test and use of marijuana, the admitted lying about having a prescription for oxycodone, and the father's explanation to the ongoing social worker that he failed to answer several calls because he was sleeping during the day, the judge could properly conclude that the father's

8

unabating substance misuse constituted "a contributing factor" to his current and future unfitness. Adoption of Xarissa, 99 Mass. App. Ct. 610, 618 (2021).

We also disagree with the father's argument that the record does not support the judge's findings regarding his housing. The judge carefully traced a timeline of the father's varied housing arrangements: he lived approximately one year with the mother and child until his arrest and incarceration in 2020; he was "homeless" and living in a shelter placement starting in September 2020; he lived with another person from January 2021 through at least September 2022 when he fell behind in rent and utilities; and finally, following his marriage, he lived with his wife and her three sons. While the record supports that the father's housing stabilized in the time leading up to the trial, it also showed an unwillingness by the father to inform the department of changes in housing or to schedule home visits, both of which were required by his action plans. Even when he had stable housing, the father testified that he owed several thousand dollars in overdue rent and utility payments, ultimately causing his electricity service to be disconnected. Thus, the record supports the judge's finding that the father's housing instability contributed to his parental unfitness. See Adoption of Abigail, 23 Mass. App. Ct. 191, 196 (1986) ("A past

pattern of behavior . . . has prognostic value").  See also Adoption of Yvonne, 99 Mass. App. Ct. 574, 581 (2021) (judge properly considered housing instability where department was unable to verify parent's living situation or conduct home visits).

Contrary to the father's claim, the record also supports the judge's findings regarding untreated symptoms of mental health conditions.  The father argues that the department's difficulties in contacting his providers was not sufficient to find him unfit.  While the judge found that the father "shielded his providers from the [d]epartment[,]" this finding was only one of many findings bearing on the father's mental health.  For example, as previously discussed, the judge found that the father was unable to manage his own medications.  One department worker testified that the father was unable to produce his medication during several home visits, and on the few occasions that he could, the medication bottles had old labels or were empty.  This evidence supported the judge's logical conclusion that the "[f]ather's inability to manage his own medication is a predictor that he will also be unable to manage [the child's] medications."  See Adoption of Frederick, 405 Mass. 1, 9 (1989) (symptoms of parent's mental health conditions may impair

10

"capacity to assume parental responsibility, and ability to deal with a child's . . . needs").

The evidence also supported the judge's finding that the father's unfitness was likely to continue indefinitely. By the time the trial concluded, the department had been involved with the father for over three years. After all that time, as the judge noted, the concerns precipitating the department's involvement remained. Although commending the father's improvements, including completing the "nurturing fathers" program and attempting to comply with the action plan, the judge ultimately concluded that the father "falls short from making observable changes," and "there still exists a substantial risk of harm to the child." See Adoption of Paula, 420 Mass. 716, 730 (1995) (absent evidence that services have "appreciably improved" capacity to meet needs of child, mere participation in services does not equate with fitness); Adoption of Jacques, 82 Mass. App. Ct. at 608 (judge entitled to consider evidence of parent's recent improvements within context of earlier and continuing deficits). We do not substitute our judgment for that of the judge who heard the evidence.

Lastly, the father contends that the judge abused his discretion in finding that termination served the child's best interests, arguing that "dispositive" weight was given to the

11

child's bond with his foster parents.  We disagree.  The judge considered the factors set forth in G. L. c. 119, § 26, and G. L. c. 210, § 3 (c), in determining the best interests of the child.  While the judge acknowledged the child's bond with his foster parents and the emotional and psychological harm that removal would cause, there is nothing in the record to support that such consideration was dispositive.  The judge also considered the father's mental health, his history of violence, his history of housing instability, and his failure to consistently cooperate with the department.  Therefore, the judge did not abuse his discretion in determining that freeing the child for adoption was in the best interests of the child. See Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997) (parent's "dissatisfaction with the judge's weighing of the evidence and his credibility determinations" is not sufficient basis to warrant relief on appeal).

Decree affirmed.

By the Court (Meade, Walsh & Hodgens, JJ.[2]),

Clerk

Entered:  October 28, 2025.

---

[2] The panelists are listed in order of seniority.

12